235 N.J. Super. 536 (1989)
563 A.2d 473
JOHN'S COCKTAIL LOUNGE, INC., PLAINTIFF-RESPONDENT, AND JOHN GREELEY AND FLORENCE GREELEY, PLAINTIFFS,
v.
THE NORTH RIVER INSURANCE COMPANY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 24, 1989.
Decided September 5, 1989.
*537 Before Judges KING, BRODY and ASHBEY.
Regina M. Leonard, argued the cause for appellant (Joel Feldscher, attorney).
David B. Fox, argued the cause for respondent (Tomlin, Clark & Hopkin, attorneys).
*538 The opinion of the court was delivered by KING, P.J.A.D.
This case involves the duty of a comprehensive general liability insurance carrier to defend a suit brought for wrongful termination of employment. The insured prevailed by summary judgment in a suit on the policy to compel the carrier to defend and, if necessary, indemnify it. We conclude that there was no coverage and reverse.
This suit arises from a complaint filed on December 12, 1986 by Georgia DePiero against John's Cocktail Lounge, Inc. and John and Florence Greeley. DePiero alleged that she was wrongfully terminated from her job as a bartender at the Lounge in Westville, Gloucester County, for refusing to serve an alcoholic beverage to an inebriated customer on September 28, 1986. In answers to interrogatories in that suit, DePiero stated: "I was told earlier that day, by my boss, to `flag' drunk customers because the ABC was in Westville. Later that day, I was fired for doing just that." DePiero also claimed that the inebriated customer, William Umba, had threatened to have her fired. DePiero stated that after she told Umba to leave the bar, Umba replied: "Now you're pushing this too far, girl. I'm going to talk to John [Greeley] and you won't be here next week."
In a letter dated October 1, 1986, defendant John Greeley, the Lounge's manager, formally terminated DePiero's employment. The letter stated: "Please be advised effective Thursday Oct. 2, 1986 I am forced to lay you off. I have been getting to [sic] many complaints from customers. Also because of the situation you had last Saturday nite [sic] with our good steady customer when you flagged him his party left the bar. John Manager."
In her complaint DePiero alleged:
4. Plaintiff was dismissed on October 2, 1986 because she refused to serve an alcoholic beverage to an inebriated customer of John's Cocktail Lounge.
5. The termination of plaintiff's employment with defendant was against the clear mandate of public policy of the State of New Jersey.

*539 6. As a result of the wrongful termination of plaintiff's employment, plaintiff has suffered and will suffer the loss of income and fringe benefits, the loss of earnings, capacity and opportunities, the loss of other emoluments of employment, and severe and permanent emotional distress, humiliation, embarrassment and mental suffering.
7. As a further result of the wrongful termination of plaintiff's employment, plaintiff has been caused and will be caused to spend money in an effort to treat her psychological distress.
In answers to interrogatories DePiero alleged these damages:
43. Plaintiff suffered distress and mental anguish as a result of being fired because she did nothing but a good job. Her distress and anguish continue to the present time.
Because she was fired for upholding a legal duty, plaintiff does not know what to do now, with respect to her parttime bartending job, when the possibility of flagging customers arises. She feels great anxiety and stress as a result.
Plaintiff lost income as a result of being fired and incurred medical bills for psychological counselling as a result of same.
DePiero's treating psychologist's report of September 10, 1987 was incorporated by reference into DePiero's answers to interrogatories. The report, in pertinent part, stated this claim for emotional injury:
Ms. DePiero initially consulted me on 10/22/86. At that time she complained of ongoing headaches, insomnia, a high ongoing level of general anxiety, and signs and symptoms of depression. She did not present any indiction of personality, organic, or any other types of gross disturbance.
History revealed that the onset of symptoms was triggered by her being fired from her job as a barmaid. Significant to this was the fact that she enjoyed her job very much, that she was financially and emotionally dependent on it, and that she perceived her firing to be unjust. With this in mind, her presenting emotional difficulties were seen as secondary to this event and she was given the diagnosis: Adjustment reaction with mixed emotional features (DSM/III 309.28).
It is significant to note that Ms. DePiero at this time was a student in a court reporting course. Because of her reality problems relating to the loss of her job, as well as her emotional reaction to it, Ms DePiero had a great deal of difficulty maintaining the concentration needed to study and felt she was falling behind in her work, placing her status in the program in jeopardy. This served to add significantly to her already high level of anxiety and feelings of depression.
Ms. DePiero consulted me on nine occasions in individual psychotherapy. A bill for services is enclosed. She left treatment with her symptomology greatly diminished and feeling more able to constructively engage in the adjustment process.
*540 As to the incident generating the liability, the Lounge gave this answer to interrogatories by John Greeley in the underlying damage action:
I have no personal knowledge of the incident, however I am advised that on the date in question William Umba, Tom Umba, Marge Umba and Doris Lasso came to John's Cocktail Lounge with some friends. I understand that they had come from a wedding. I was advised by all of those individuals and Paul Goins that William Umba was not drunk but was refused service and embarrassed by Georgia DePiero.
The Lounge's comprehensive general liability insurance policy included the following provision:
The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
A. bodily injury or
B. property damage
to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent....
[Emphasis added.]
The policy defined "occurrence" as
an accident including continuous or repeated exposure to conditions which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.
By a letter of January 20, 1987 the North River Insurance Company declined coverage for the claim and refused to defend the suit. In February 1987 this declaratory action was started. As noted, summary judgment was granted on March 9, 1988 in favor of the Lounge, including an award of counsel fees and costs for $9,649.50 "incurred by [the Lounge] to date in defending the underlying wrongful termination case and prosecuting the within declaratory judgment action."
North River asserts that the Law Division judge erred in holding that the Lounge's insurance policy required North River to defend and indemnify DePiero's claim of wrongful termination of employment. DePiero's termination claim, as alleged in her complaint, stated that her discharge "was against the clear mandate of public policy of the State of New Jersey." DePiero obviously attempted to state a claim for relief under *541 Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 72 (1980), which adopted an exception to the common-law rule allowing an employer to discharge an employee at will or without cause. DePiero claims that she was discharged for refusing to serve a drunken patron, a reason violative of our State's public policy. See N.J.A.C. 13:2-23.1(b) (prohibiting sales to intoxicated persons).
Whatever the substantive merits of DePiero's wrongful discharge claim, we conclude that the Law Division judge erred in finding coverage available. The judge appeared to reason that the complaint alleged negligent termination for failure to properly investigate the incident, thus concluding that this was a covered risk under the liability policy.
New Jersey law is well settled concerning when an insurer must defend a case on behalf of an insured. An insurer's duty to defend a lawsuit is determined by comparing the complaint's allegations with the insurance policy's coverage provisions. The duty exists only if the complaint states a theory of recovery for which the policy provides coverage. The Ohio Cas. Ins. Co. v. Flanagin, 44 N.J. 504, 512, 514 (1965); Danek v. Hommer, 28 N.J. Super. 68, 77 (App.Div. 1953), aff'd o.b. 15 N.J. 573 (1954). The duty to defend is measured without regard to the merits of the claim. Hence, courts have stated that the duty to defend is broader than the duty to pay. Lumbermen's v. United Serv. Auto., 218 N.J. Super. 492, 497 (App.Div. 1987); NPS Corp. v. Insurance Company of North America, 213 N.J. Super. 547, 550-551 (App.Div. 1986); Danek, 28 N.J. Super. at 79.
North River contends that the liability policy does not cover this wrongful termination claim because the dismissal was not accidental. The policy requires North River to defend and pay damages arising from an occurrence, which is defined as "an accident ... which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." North River contends that the word "accident" *542 must be given its plain meaning: "an unexpected happening without intention or design." Black's Law Dictionary (5th edd. 1979) at 14. We agree.
DePiero's dismissal was not an accident. She claims in her complaint that she "was dismissed on October 2, 1986 because she refused to serve an alcoholic beverage to an inebriated customer" and that this termination of her employment was "against the clear mandate of public policy of the State of New Jersey." The fact that the Lounge may have discharged DePiero carelessly or that the discharge resulted in a claim of emotional bodily injury does not control. The accidental or non-accidental quality of the alleged occurrence controls.
The California Court of Appeals has addressed specifically the issue of insurance coverage for wrongful termination of employment. Both Commercial Union Ins. v. Superior Court, 196 Cal. App.3d 1205, 242 Cal. Rptr. 454 (Ct.App. 1987), and Royal Globe Ins. v. Whitaker, 181 Cal. App.3d 532, 226 Cal. Rptr. 435 (Ct.App. 1986), are particularly persuasive; both construe the exact policy language presented in the case before us.
Commercial Union Ins. involved an insurance company which sought a declaratory judgment that a general business liability policy did not cover a claim for an intentional firing by the insured of one of his employees. A former employee had sued the insured, a licensed insurance broker, for wrongful discharge. The insured employer claimed "that he did not expect the employee to experience severe emotional distress as a result of the termination." 242 Cal. Rptr. at 454. The California appellate court rejected this contention, holding that an intentional termination was not an "occurrence" under the policy and that termination was "not an accident." Id. at 456. That court concluded that the definition of "accident" defeated any argument that the insured "intended his act but not the resulting harm." Id.
*543 In Royal Globe Ins. Co. v. Whitaker the insurer sought a determination of its duty to defend and indemnify a contractor in an underlying action involving alleged fraudulent inducement and breach of a construction contract. 226 Cal. Rptr. at 435. The contractor had promised to build a house, to sell it to the Whitaker appellants, and to close on a particular date. The appellants alleged "mental anguish, nervousness, anxiety worry and disappointment," among other damages, as a result of the contractor's "fraud and deceit." Id. at 436. The California court ruled that the breach was not caused by an "accident." Even if the builder had intended his act but not the resultant harm, the event did not constitute an "occurrence" within the policy's language. Id. at 437-438.
Other authorities agree. In St. Paul Mercury Ins. v. Medical Lab. Network, Inc., 690 F. Supp. 901, 903 (C.D.Cal. 1988), the District Court stated:
Numerous cases have held that the actual discharge of an employee cannot be an accidental event and that there is no coverage for such discharge where the policy contains an exclusion for intentional acts. See Commercial Union Co. v. Superior Court, 196 Cal. App.3d 1205, 242 Cal. Rptr. 454 (1987); St. Paul Fire and Marine Ins. Co. v. Superior Court, 161 Cal. App. 3d 1199, 208 Cal. Rptr. 5 (1984). It has also been held that any emotional distress which resulted from the intentional discharge is, in effect, a derivative injury and must also be considered intentional. Hartford Fire Ins. Co. v. Karavan Enterprises, Inc., 659 F. Supp. 1077, 1081 (N.D.Cal. 1987).
In Hartford Fire Ins. Co. v. Karavan Enterprises, Inc., 659 F. Supp. 1077, 1081 (N.D.Cal. 1987), the District Court stated:
For purpose of insurance coverage the act of discharge is the determinative event. St. Paul Fire & Marine Ins. Co., ... demonstrates that an intentional discharge cannot constitute an unintended or unexpected "occurrence." So, too, negligence claims based on the discharge fall within the ambit of the claim for wrongful discharge. See St. Paul Mercury Ins. Co. v. Ralee Eng'g Co., 804 F.2d 520, 522 (9th Cir.1986). Claims for negligent conduct must be treated analytically as an integral part of the assertedly wrongful discharge. Any alleged harm comes about as an intended or unintended consequence of the conduct of discharge, but in neither case constitutes an "accident ... which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Royal Globe Ins. Co. v. Whitaker, 181 Cal. App.3d 532, 537-538, 226 Cal. Rptr. 435 (1986).
*544 In accord are E-Z Loader Boat Trailers, Inc. v. Travelers Indemnity Co., 106 Wash.2d 901, 906, 726 P.2d 439, 442 (1986) (employees' sex and age discrimination claims for wrongful discharge not covered by employer's comprehensive general liability policy for accidental injuries); St. Paul Fire & Marine Ins. v. Campbell Cty. School, 612 F. Supp. 285, 287 (D.C.Wyo. 1985) (civil rights action based on claim by teacher that she was demoted, harassed and subjected to emotional suffering not an "occurrence" within meaning of comprehensive general liability policy); see also Mary & Alice Ford Nurs. Home v. Fireman's Ins., 86 App.Div.2d 736, 446 N.Y.S.2d 599 (App.Div.), aff'd o.b. 57 N.Y.2d 656, 454 N.Y.S.2d 74, 439 N.E.2d 883 (Ct.App. 1982) (court rejected employee's claim that emotional injuries were unexpected consequences of an intended act). In Deseret Federal Savings and Loan Association v. United States Fidelity and Guaranty Company, ___ Utah 2d ___, 714 P.2d 1143 (Utah 1986), the Utah Supreme Court held that damages recovered for constructive eviction were not "unexpected or unintended" property damages covered by an "accidental occurrence" policy. See Appleman, 7A Insurance Law and Practices, § 4492 at 14, 19 (1979) (construction of policy  accidental versus intentional injuries).
We conclude that North River's comprehensive general liability policy did not cover the claim arising from DePiero's intentional discharge by John Greeley, the Lounge's manager. We reverse the Law Division's judgment.
BRODY, J.A.D., concurring.
I write separately because in my view the majority opinion disposes of this appeal without fully acknowledging the insured's argument, which the trial judge held was sound. At the same time, the insured's theory of coverage, even if sound, is not supported by the evidence, and therefore does not warrant the difficult analysis necessary to test it.
The insured's main point is not that DePiero's termination was unintended because the insured did not intend to fire her or to *545 cause her the damages she claims to have sustained. Rather, the insured contends that DePiero's termination was unintended because it did not intend to fire her for refusing "to serve an alcoholic beverage to an inebriated customer ...," an essential causal element of her claim as asserted in her complaint. The argument, not fully met in the majority opinion, is that Greeley's negligent investigation of the flagging incident led him to conclude mistakenly that DePiero had arbitrarily refused to serve a patron who was not visibly intoxicated, a state of facts that arguably would render the insured liable to DePiero for the firing and invoke coverage under the policy.
Although DePiero did not base her claim on having been negligently fired, where a liability plaintiff could recover on a state of facts as alleged in the complaint which, if true, does not invoke coverage but could also recover on an actual state of facts that does invoke coverage, coverage depends "upon the actual facts and not upon the allegations in the complaint." Burd v. Sussex Mutual Insurance Company, 56 N.J. 383, 388 (1970).
To be sure, there remains the fundamental question of whether there is evidence of an actual state of facts under which DePiero could recover that would constitute an "occurrence" as defined in the policy. The fact that Greeley intended to fire DePiero, however, is not the end of the inquiry. For instance, a surgeon performing an operation intends to injure the patient. There is usually no liability, however, because the patient has consented to the assault. If through negligence, however, the surgeon had not adequately warned the patient of a risk, the patient's consent would not protect the surgeon from liability for that risk. In such circumstances, at least arguably, the operation, though an intentional act, could be considered an "occurrence" invoking coverage under a malpractice policy worded like the one before us.
The Ohio Supreme Court has held that a defamation, an intentional act, may be an "occurrence" under a liability policy. Although negligence was not alleged in the underlying liability *546 complaint, the Ohio plaintiff could recover under Ohio law if before publication the insured could within the exercise of reasonable care have ascertained that the matter was untrue. City of Willoughby Hills v. Cincinnati Ins., 9 Ohio St.3d 177, 459 N.E.2d 555 (Ohio 1984).
I find it unnecessary to sail these unchartered New Jersey waters to a port because there is no evidence in this record to support the insured's claim that DePiero's termination was the product of Greeley's careless investigation. The only evidence on the point is Greeley's answer to an interrogatory in the liability action:
[Q.] Set forth defendant's version of the incident which occurred on or about September 27, 1986, and specifically include the names and addresses of each and every individual who can corroborate defendant's version.
[A.] I have no personal knowledge of the incident, however I am advised that on the date in question William Umba, Tom Umba, Marge Umba and Doris Lasso came to John's Cocktail Lounge with some friends. I was advised by all of those individuals and Paul Goins that William Umba was not drunk but was refused service and embarrassed by Georgia DePiero. [Emphasis added.]
It is by no means clear that Greeley's answer refers to an investigation of the incident that he had conducted before he fired DePiero. Also, DePiero's refusal to serve the patron was protected conduct if the patron merely appeared to be intoxicated even though he "was not drunk." N.J.A.C. 13:2-23.1(b) provides in part:
No licensee shall ... serve ... any alcoholic beverage ... to any person actually or apparently intoxicated....
Thus Greeley could not have believed that he was justified in terminating DePiero's employment even if the facts were as he claims to have learned them. A licensee is charged with knowing the scope of Alcoholic Beverage Control regulations. Although its careless investigation of facts might be considered accidental thereby invoking liability coverage, the same cannot be said for its ignorance of the law that governs its business.
I concur in the reversal for the reasons stated.