607 A.2d 1266

SL INDUSTRIES, INC., A NEW JERSEY CORPORATION, PLAIN-
TIFF–RESPONDENT, v. AMERICAN MOTORISTS INSURANCE
COMPANY AND KEMPER GROUP INSURANCE COMPANY,
DEFENDANTS AND THIRD–PARTY PLAINTIFFS–APPEL-
LANTS, v. FEDERAL INSURANCE COMPANY, THIRD–PARTY
DEFENDANT.

Argued February 4, 1992—Decided June 17, 1992.

*William A. Garrigle* argued the cause for appellants (*Garrigle and Palm,* attorneys; *William A. Garrigle* and *Deborah T. Wolf,* on the briefs).

*Stacy L. Moore, Jr.,* argued the cause for respondent (*Parker, McCay & Criscuolo,* attorneys; *Mary Ann C. O'Brien,* on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

Like *Voorhees v. Preferred Mutual Ins. Co.,* 128 *N.J.* 165, 607 *A.*2d 1255 (1992), also decided today, this case requires us to determine an insurance company's duty to defend and indemnify an insured. We first address whether the duty to defend is determined solely by the information included in the complaint in the underlying action, or whether it can also be triggered by information conveyed to the insurer at a later stage in the underlying action. In this connection, we address the insured's duty to inform the insurer of all relevant information promptly or forego reimbursement for its defense costs. Second, we discuss whether alleged emotional distress, without physical manifestations, constitutes a "bodily injury" covered by SL Industries' bodily-injury policy or a "personal injury" covered by the company's personal-injury policy. Third, as in *Voorhees,* we consider whether the injuries caused by SL Industries were accidental enough to constitute an "occurrence" covered by the policy. Finally, we address the apportionment of defense and settlement costs between covered and non-covered claims.

I

SL Industries seeks a declaration of insurance coverage for its liability to Newell E. Whitcomb, formerly one of the company's vice-presidents. According to Whitcomb's complaint, in March 1984 SL Industries' Chief Executive Officer, John Instone, told Whitcomb that the company intended to eliminate his position. Instone suggested that Whitcomb agree to a special early retirement proposal under which he would retire

on his sixty-second birthday, in September 1985. Relying on that information, Whitcomb agreed to the retirement proposal. Several months before his departure, SL Industries hired a new executive. Whitcomb alleged that that new executive was his replacement, and that the assertion that his position was to be eliminated was simply a pretext to force his early retirement.

In January 1986 Whitcomb filed a complaint in federal district court against SL Industries and Instone in which he alleged that their inducement of his retirement and provision of an insufficient bonus constituted willful age discrimination in violation of the Age Discrimination in Employment Act, 29 *U.S.C.A.* §§ 621 to 634 (ADEA). Whitcomb's complaint also alleged common-law fraud based on SL Industries' and Instone's false assertion that his position would be eliminated.

SL Industries was insured by American Motorists Insurance Company and Kemper Insurance Group (American) under two insurance policies. Under its General Liability Policy, SL Industries was insured

> for all sums which the Insured shall become legally obligated to pay as damages because of * * * [b]odily injury * * * caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury * * * even if the allegations of the suit are groundless, false or fraudulent * * *.

The policy defined "bodily injury" as "bodily injury, sickness or disease," and defined an "occurrence" as an "accident * * * which results in bodily injury * * * neither expected nor intended from the standpoint of the insured."

SL Industries was insured for liability from personal-injury claims under a Comprehensive Catastrophe Liability Policy. In that policy, the insurance company agreed

> to indemnify the insured for sums which the insured shall become obligated to pay as damages, direct or consequential, and expenses * * * by reason of liability * * * because of personal injury * * * arising out of an occurrence * * *.

The policy defined "personal injury" as

> (a) bodily injury, shock, sickness or disease (including death, mental anguish and mental injury resulting therefrom); * * * or (d) injury arising out of libel, slander, defamation of character, humiliation or invasion of right of privacy * * *.

The policy's definition of "occurrence" was essentially the same as that of the General Liability Policy, except that it referred to personal, rather than bodily, injury.

In March 1986 SL Industries sought American's aid in defending against Whitcomb pursuant to the policies' "duty to defend" provisions. In May 1986 the insurance company declined to defend, arguing that SL Industries' bodily- and personal-injury policies did not cover liability for the events alleged in the underlying complaint.

Shortly thereafter, additional information regarding the nature of Whitcomb's injuries was adduced during discovery in the underlying suit. In answer to interrogatories requesting the factual basis for his damages claim, Whitcomb stated that he had "suffered loss of sleep, loss of self esteem, humiliation and irritability." In a supplement to his initial response, he stated that he had "received treatment for his emotional pain and suffering * * *." In his Pretrial Stipulation and Order, Whitcomb indicated that he sought "an additional $150,000 to compensate for physical and mental pain and suffering, including humiliation, loss of self-esteem, irritability and sleeplessness."

In July 1988 SL Industries again requested coverage. At that point, two years after it had received the additional information regarding Whitcomb's injuries, SL Industries finally relayed that information to American by providing the carrier with a copy of the Pretrial Order describing the injuries for which Whitcomb sought compensation. After some independent investigation, American again declined to defend the suit.

A few weeks later, in September 1988, Whitcomb and SL Industries settled for $430,000. SL Industries alleges it spent approximately $100,000 in legal fees.

In January 1989 SL Industries brought suit against American seeking a declaration that the matter was covered by both the General Liability Policy for bodily injuries and the Comprehensive Catastrophe Liability Policy for personal injuries. It also

sought compensatory damages, punitive damages, costs of the suit, attorney fees, and any other relief the court deemed just. In March 1990 both parties filed motions for partial summary judgment.

In an oral opinion, the Law Division granted American's motion for summary judgment and denied SL Industries' motion. The court held that the complaint did not obligate American to defend the underlying suit because it did not state any claims falling within the terms of the policies. The sole issue was whether the additional information regarding Whitcomb's injuries adduced through discovery and later forwarded to American triggered the duty to defend. The court held that when the insured provided the insurance company with the information regarding Whitcomb's injuries two years after the suit had been brought and only one-and-one-half months before the case settled, the carrier did not have an obligation to "pick up the defense of the case or to indemnify for that case."

The Appellate Division reversed, holding that "once American possessed knowledge of Whitcomb's claim for emotional damages, its duty to defend was triggered under the terms of the policies." 248 *N.J.Super.* 458, 466, 591 *A.*2d 677 (1991). Furthermore, citing the line of cases including *Voorhees v. Preferred Mut. Ins. Co.*, 246 *N.J.Super.* 564, 588 *A.*2d 417 (App. Div.1991), *Wolfe v. State Farm Ins. Co.*, 224 *N.J.Super.* 348, 540 *A.*2d 871 (App.Div.), *certif. denied,* 111 *N.J.* 654, 546 *A.*2d 562 (1988), *Lumbermen's Mut. Ins. Co. v. United Services Automobile Ass'n,* 218 *N.J.Super.* 492, 528 *A.*2d 64 (App.Div. 1987), and *NPS Corp. v. Insurance Co. of N. Am.,* 213 *N.J.Super.* 547, 517 *A.*2d 1211 (App.Div.1986), the court concluded that "Whitcomb's claim for mental pain and suffering qualifies as an assertion of bodily and personal injury under the General Liability and Comprehensive Catastrophe policies." 248 *N.J.Super.* at 464, 591 *A.*2d 677.

The court also held that Whitcomb's emotional damage claim may have constituted an occurrence within the meaning of the

policy. Defining an "occurrence" as an accident, the court recognized that "coverage will not be provided for intended results," but emphasized that it "will be provided for the unintended and unforeseen results of an intentional act." *Id.* at 465, 591 *A*.2d 677. Whether Whitcomb's emotional distress was intended or unexpected required a factual determination. Accordingly, the court reversed the Law Division's grant of summary judgment and remanded for further proceedings. *Id.* at 466, 591 *A*.2d 677.

With respect to the allocation of costs, the court noted that the statutes under which Whitcomb sued do not permit compensatory damages for emotional pain and suffering. The court therefore directed the trial court to conduct, on remand, a hearing to determine the extent to which the settlement had been based on emotional injury for common-law fraud, and to allocate the coverage and defense costs accordingly. *Id.* at 467, 591 *A*.2d 677.

We granted American's petition for certification. 126 *N.J.* 385, 387, 599 *A*.2d 162, 163 (1992).

## II

As we noted in *Voorhees*, the duty to defend is generally determined by comparing the allegations in the complaint with the language of the policy. 128 *N.J.* at 173, 605 *A*.2d 1255. When the two correspond, the insurer must defend the suit.

Whitcomb's first two counts alleged that by inducing his retirement and providing a smaller bonus than that commensurate with his status and abilities, SL Industries violated the Age Discrimination in Employment Act, 29 *U.S.C.A.* §§ 621 to 634. Recoverable damages under the ADEA are limited to unpaid minimum wages, unpaid overtime compensation, and, in the event of a willful violation, liquidated damages. 29 *U.S.C.A.* § 626(b). Judicial interpretation of the ADEA has clearly held that it does not allow the recovery of compensatory damages for emotional injuries caused by age discrimination. *Haskell v.*

*Kaman Corp.*, 743 *F.*2d 113, 120–21 (2d Cir.1984); *Rogers v. Exxon Research & Eng'g Co.*, 550 *F.*2d 834, 840–42 (3d Cir. 1977), *cert. denied*, 434 *U.S.* 1022, 98 *S.Ct.* 749, 54 *L.Ed.*2d 770 (1978). The insurance policies would therefore not cover any liability for potential statutory violations.

■ The third count of the complaint alleged simply that Instone's acts inducing Whitcomb to retire constituted common-law fraud. Nothing about that allegation could have alerted the insurance company that the fraud had led to bodily or personal injuries potentially covered under the policies. Indeed, at the time SL Industries forwarded the complaint to American, neither SL Industries nor American was aware that Whitcomb had suffered any emotional distress. Because the complaint contained the only information American had about the underlying suit, and because the complaint did not allege any covered injuries triggering the duty to defend, American's May 1986 decision not to defend the action was appropriate. However, by June 1986 SL Industries had learned of additional facts that potentially triggered American's duty to defend. In his response to interrogatories, dated June 1986, Whitcomb stated that as a result of SL Industries' treatment of him he "suffered loss of sleep, loss of self-esteem, humiliation, and irritability." SL Industries failed to forward that information to American until July 1988, over two years later. At that time, shortly before settling with Whitcomb, SL Industries once again requested and was denied coverage.

## A. *Coverage Based on Facts Extrinsic to the Complaint*

The first question is whether the duty to defend is triggered by facts indicating potential coverage that arise during the resolution of the underlying dispute. We conclude that facts outside the complaint may trigger the duty to defend.

■ Our holding is in accord with most insureds' objectively-reasonable expectations. Insureds expect their coverage and defense benefits to be determined by the nature of the claim

against them, not by the fortuity of how the plaintiff, a third party, chooses to phrase the complaint against the insured. *See National Indem. Co. v. Flesher*, 469 *P.*2d 360, 365–67 (Alaska 1970); *Loftin v. U.S. Fire Ins. Co.*, 106 *Ga.App.* 287, 127 *S.E.*2d 53, 59 (1962). To allow the insurance company "to construct a formal fortress of the third party's pleadings and to retreat behind its walls, thereby successfully ignoring true but unpleaded facts within its knowledge that require it, under the insurance policy, to conduct the putative insured's defense" would not be fair. *Associated Indem. v. Insurance Co. of N. Am.*, 68 *Ill.App.*3d 807, 25 *Ill.Dec.* 258, 265, 386 *N.E.*2d 529, 536 (1979).

Many states agree that the duty to defend is triggered not only by the allegations in the complaint, but by the later discovery of relevant facts. As Appleman concludes,

> The insurer cannot safely assume that the limits of its duties to defend are fixed by the allegations a third party chooses to put into his complaint, since an insurer's duty is measured by the facts * * *.
>
> [J.A. Appleman, 7C *Insurance Law and Practice* § 4683, at 56 (Berdal ed. 1979).]

*See National Indem. Co. v. Flesher, supra*, 469 *P.*2d at 365–67; *Gray v. Zurich Ins. Co.*, 65 *Cal.*2d 263, 54 *Cal.Rptr.* 104, 112–13, 419 *P.*2d 168, 176–77 (1966); *Loftin v. U.S. Fire Ins. Co., supra*, 127 *S.E.*2d at 58; *Patrons Mut. Ins. Ass'n v. Harmon*, 240 *Kan.* 707, 732 *P.*2d 741, 744 (1987); *Waste Management v. Peerless Ins. Co.*, 315 *N.C.* 688, 340 *S.E.*2d 374, 377–78 (1986).

### B. *Insured's Responsibility to Inform Insurer of Relevant Facts*

We stress that the duty to defend is triggered by facts *known* to the insurer. Although the insurer cannot ignore known information simply because it is not included in the complaint, the insurer has no duty to investigate possible ramifications of the underlying suit that could trigger coverage. Rather, the insured being sued is responsible for promptly conveying to its insurance company the information that it

believes will trigger coverage. If it conveys that information properly and promptly, it will be reimbursed for previously-expended defense costs. *Cf. Burd v. Sussex Mut. Ins. Co.*, 56 *N.J.* 383, 390, 267 *A.*2d 7 (1970) (where insurer did not undertake defense initially, duty to defend translated into duty to reimburse insured). However, if the insured does not properly forward the information to the insurance company, the insured cannot demand reimbursement from the insurer for defense costs the insurer had no opportunity to control.

In another context, we have recognized that "the insurer * * * has the exclusive right under the policy to control the claim and to effectively deter the insured from taking any action that will interfere with the insurer's right to control the matter." *Griggs v. Bertram*, 88 *N.J.* 347, 362, 443 *A.*2d 163 (1982). As one court has noted, "[t]he insurer's duty to defend corresponds to the insured's duty to relinquish control of the defense, and one cannot arise without the other." *Crist v. Insurance Co. of N. Am.*, 529 *F.Supp.* 601, 603 (D.Utah 1982). In *Crist*, the court likewise held the insured responsible for informing the insurer of relevant information, and likewise refused to allow the insured to recover his expenses prior to the insured's tendering the defense to the insurer. *Id.* at 604.

■ Accordingly, when the insured's delay in providing relevant information prevents the insurer from assuming control of the defense, the insurance company is liable only for that portion of the defense costs arising after it was informed of the facts triggering the duty to defend. As discussed above, SL Industries received information relevant to American's decision on whether to defend only one month after American had initially denied coverage, but did not forward that information to American until two years later, a few weeks before settlement. To the extent that American was under a duty to defend the suit, SL Industries' delay in providing the relevant information estops it from claiming reimbursement for its full defense costs. It may recover only those costs expended between the

date it notified American of the facts necessary to determine coverage and the date of the settlement.

### III

#### A. *Coverage Under the Bodily–Injury Policy*

SL Industries' General Liability Policy obligated American to defend the company for liability for "bodily injury," defined as "bodily injury, sickness or disease." In *Voorhees v. Preferred Mutual, supra,* we concluded that when emotional distress results in physical manifestations the term "bodily injury" is ambiguous, and must therefore be construed in favor of the insured. 128 *N.J.* at 178, 607 *A.*2d 1255. We noted that such an interpretation accords with an insured's objectively-reasonable expectations. *Ibid.*

Here Whitcomb, through his response to interrogatories, indicated that he had "suffered loss of sleep, loss of self-esteem, humiliation, and irritability." The final pretrial Stipulation and Order indicated that Whitcomb was seeking damages for "physical and mental pain and suffering, including humiliation, loss of self-esteem, irritability and sleeplessness."

We must determine whether Whitcomb's symptoms constitute physical injuries resulting from emotional distress. The only symptom that might remotely be considered a physical injury is his alleged sleeplessness. Although we recognize that there is no litmus test for determining where to draw the line between emotional and physical injuries, we nonetheless believe that such a distinction exists. Even acknowledging that it is not unusual for emotional distress to cause physical symptoms, *see Voorhees, supra,* 128 *N.J.* at 178, 607 *A.*2d 1255, not all emotional distress is physically manifested. In evaluating whether sleeplessness is an emotional or physical condition, we conclude that it is, at base, emotional in nature. To designate sleeplessness a physical injury would be tantamount to conceding that emotional and physical injuries are indistinguish-

able. In contrast, the headaches, stomach pains, nausea, body pains, and medically-diagnosed "undue amount of physical complaints" that resulted from emotional distress in our companion case, *Voorhees*, do fall on the side of physical injuries. As in *Voorhees, supra,* 128 *N.J.* at 179, 607 *A.*2d 1255, we note that our evaluation of what constitutes a "bodily injury" triggering insurance coverage is not intended to define the term "bodily injury" with respect to an emotional-distress claim under tort law. *Cf. Buckley v. Trenton Saving Fund Soc'y,* 111 *N.J.* 355, 366–69, 544 *A.*2d 857 (1988) (discussing level of injury necessary to sustain tort claim for infliction of emotional distress).

■ The question next presented is whether emotional distress unaccompanied by physical injuries can be deemed within the coverage of an insurance policy protecting against liability for bodily injuries. As we noted in *Voorhees,* whether a policy phrase is ambiguous depends on the factual context in which it is applied. 128 *N.J.* at 176, 607 *A.*2d 1255. The parties and the courts in both this case and *Voorhees* cite a trilogy of recent Appellate Division cases as support for their contentions that the symptoms alleged do or do not constitute covered bodily injuries. *See Wolfe, supra,* 224 *N.J.Super.* at 352–54, 540 *A.*2d 871; *Lumbermen's Mutual, supra,* 218 *N.J.Super.* at 497–500, 528 *A.*2d 64; *NPS Corp., supra,* 213 *N.J.Super.* at 551–54, 517 *A.*2d 1211. We do not, however, find those cases helpful in evaluating the coverage issue presented here. Viewed together, the cases present irreconcilable inconsistencies and ambiguities lacking coherent underlying principles. The parties' conflicting interpretations demonstrate those cases' inutility as supporting precedent.

We hold that in the context of purely emotional distress, without physical manifestations, the phrase "bodily injury" is not ambiguous. Its ordinary meaning connotes some sort of physical problem.

Many jurisdictions agree that the term "bodily injury" is not ambiguous in its requirement that an injury have some physical

component in order to be considered "bodily." *See State Farm Fire & Casualty Co. v. Hiermer,* 720 *F.Supp.* 1310, 1315 (S.D.Ohio 1988); *Aetna Casualty & Sur. Co. v. First Sec. Bank of Bozeman,* 662 *F.Supp.* 1126 (D.Mont.1987); *American & Foreign Ins. Co. v. Church Schools Diocese of Virginia,* 645 *F.Supp.* 628 (E.D.Va.1986); *Continental Casualty Co. v. Synalloy Corp.,* 667 *F.Supp.* 1550 (S.D.Ga.1985); *St. Paul Fire & Marine Ins. Co. v. Campbell City Schools,* 612 *F.Supp.* 285, 287–88 (D.C.Wyo.1985); *Rolette County v. Western Casualty & Sur. Co.,* 452 *F.Supp.* 125, 130 (D.N.D.1978); *Aim Ins. Co. v. Culcasi,* 229 *Cal.App.*3d 209, 280 *Cal.Rptr.* 766, 771–72 (1991); *Presidential Hotel v. Canal Ins. Co.,* 188 *Ga.App.* 609, 373 *S.E.*2d 671, 672 (1988); *Dahlke v. State Farm Mut. Automobile Ins. Co.,* 451 *N.W.*2d 813 (Iowa 1990); *Albin v. State Farm Mut. Automobile Ins. Co.,* 498 *So.*2d 171 (La.Ct.App.1986); *Allstate Ins. Co. v. Diamant,* 401 *Mass.* 654, 518 *N.E.*2d 1154, 1157 (1988); *Greenman v. Michigan Mut. Ins. Co.,* 173 *Mich. App.* 88, 433 *N.W.*2d 346, 348–49 (1988); *Farm Bureau Mut. Ins. Co. of Michigan v. Hoag,* 136 *Mich.App.* 326, 356 *N.W.*2d 630, 633 (1984); *Clemens v. Wilcox,* 392 *N.W.*2d 863 (Minn. 1986); *Artcraft v. Lumberman's Mut. Casualty Co.,* 126 *N.H.* 844, 497 *A.*2d 1195, 1196 (1985); *Mellow v. Medical Malpractice Joint Underwriting Ass'n,* 567 *A.*2d 367, 368 (R.I.1989); *E–Z Loader Boat Trailers v. Travelers Indem. Co.,* 106 *Wash.*2d 901, 726 *P.*2d 439, 443 (1986).

We find unpersuasive the case law construing "bodily injuries" to include emotional injuries without physical manifestations. First, some courts are unpersuasive because their conclusory holdings are largely unexplained. *See Allstate Ins. Co. v. Biggerstaff,* 703 *F.Supp.* 23, 25 (D.S.C.1989); *Omark Indus. v. Safeco Ins. Co. of Am.,* 590 *F.Supp.* 114 (D.Or.1984); *Bloodworth v. Carroll,* 455 *So.*2d 1197 (La.Ct.App.1984); *Loewenthal v. Security Ins. Co. of Hartford,* 50 *Md.App.* 112, 436 *A.*2d 493 (1981).

Second, other courts have concluded that the impossibility of separating physical from mental symptoms justifies the conclusion that both mental and physical injuries are bodily injuries. *See Abellon v. Hartford Ins. Co.*, 167 *Cal.App.*3d 21, 212 *Cal.Rptr.* 852, 855–57 (1985); *Levy v. Duclaux*, 324 *So.*2d 1, 10 (La.Ct.App.1975) *NPS Corp., supra*, 213 *N.J.Super.* at 551, 517 *A.*2d 1211. We recognize that the difficulty in distinguishing between mental and physical injuries may justify characterizing "bodily injury" to be ambiguous in some circumstances. *See, e.g., Voorhees, supra*, 128 *N.J.* at 176, 178, 607 *A.*2d 1255 (when emotional distress is accompanied by such physical manifestations as nausea and headaches, the term bodily injury is ambiguous). Nonetheless, that occasional difficulty does not justify holding the term "bodily injury" to be ambiguous with respect to all types of emotional injuries. The phrase should be analyzed on a case-by-case basis to determine whether the alleged injuries are sufficiently akin to physical injuries to render the term "bodily injury" ambiguous. As discussed *supra* at 201–202, 607 *A.*2d at 1273–1274, such an examination in this case discloses that Whitcomb's alleged injuries do not qualify as bodily injuries.

Nor are we persuaded by the argument that we should find emotional-distress claims within the coverage of a bodily-injury policy because insurance coverage ought to conform to developments in tort law. When the standard insurance language was developed, it was designed to cover insureds against the type of suits most likely to be brought against them—suits claiming bodily injuries. Now that tort law has expanded to recognize claims for emotional distress, both with and without physical manifestations, the argument is that an insured would reasonably expect coverage to be extended to those suits. We disagree. Tort law and insurance law are not coextensive. When tort law changes, courts should not presume whether, and to what degree, the parties would want those developments reflected in the contract. Regardless of changes in tort law, an

insured does not reasonably expect the policy to be interpreted in ways that contravene the contract's language.

Moreover, this case does not present a situation in which an insured's objectively-reasonable expectations are so contrary to the policy's ordinary meaning that they should overcome that meaning. *Werner Indus. v. First State Ins. Co.*, 112 *N.J.* 30, 35–36, 548 *A.*2d 188 (1988). Most insureds understand that the coverage of their "bodily injury" policies is limited to injuries involving some sort of connection with a physical problem.

In sum, we conclude that in the context of purely emotional injuries, without physical manifestations, the phrase "bodily injury" is not ambiguous. Its ordinary meaning connotes a physical problem. Because Whitcomb's emotional claims lacked physical manifestations, *supra* at 200–202, 607 *A.*2d at 1273–1274, SL Industries will not be able to recover for its liability to Whitcomb under the bodily-injury policy.

Although we find it unnecessary to untangle the web of New Jersey precedent interpreting insurance coverage for liability for emotional injuries, one issue subject to persistent misinterpretation merits clarification. The insurance company and the case law interpret *Lumbermen's Mutual* to hold that emotional distress will be considered a bodily injury only when infliction of emotional distress is alleged as an *independent* cause of action, not when the distress is a *consequence* of another cause of action, such as the allegation of fraud in the present action. *Vargas v. Calabrese*, 714 *F.Supp.* 714, 721 (D.N.J.1989) (applying New Jersey law); *Voorhees, supra,* 246 *N.J.Super.* at 573–75, 588 *A.*2d 417; *Wolfe, supra,* 224 *N.J.Super.* at 351–52, 540 *A.*2d 871. The confusion stems from the court's conclusion in *Lumbermen's Mutual* that emotional distress would not be considered a potential bodily injury because, in a defamation action, emotional distress is only " 'an element of "parasitic" damage attached to an independent cause of action.' " 218 *N.J.Super.* at 498, 528 *A.*2d 64 (quoting *Prosser & Keeton on Torts* § 111, at 771 (5th ed. 1984)). That language referred to

the unique status of emotional-distress claims in a defamation action, however, not to emotional-distress claims generally. In most circumstances, coverage under a bodily-injury policy is determined by analyzing the injury, not the cause of action alleged. As has been noted, "standard bodily-injury policies

> do not predicate coverage on the theory of the wrong; rather, the nature of the injury generally determines coverage.
>
> \* \* \* \* \* \* \* \*
>
> Consequently, analysis must focus initially on the nature of the injuries alleged in the complaint rather than on the legal theory presented."
>
> [John E. Peer and Ronald E. Mallen, "Insurance Coverage of Employment Discrimination and Wrongful Termination Actions," 54 *Defense Counsel J.* 464, 470–71 (1987).]

SL Industries' liability for emotional distress resulting from fraudulent actions is not covered under the bodily-injury policy because it does not allege a "bodily injury"; that infliction of emotional distress was not alleged as an independent cause of action is irrelevant.

### B. *Coverage Under the Personal–Injury Policy*

 SL Industries' Comprehensive Catastrophe Liability Policy obligated American to defend SL Industries against liability for "personal injury," defined as

> (a) bodily injury, shock, sickness or disease (including death, mental anguish and mental injury resulting therefrom); \* \* \* or (d) injury arising out of libel, slander, defamation of character, humiliation, or invasion of right of privacy.

Whitcomb's allegation that he suffered from humiliation clearly falls within the policy's explicit coverage for "injury arising out of \* \* \* humiliation." American thus had a duty to defend the claim.

SL Industries also claims that the personal injury policy covers "mental anguish and mental injury." That claim misreads the policy, however, which provides for mental injuries *arising out of* bodily injuries. Because, as discussed above, Whitcomb did not allege bodily injuries, that provision of the policy does not provide coverage.

## IV

SL Industries' General Liability Policy for bodily injuries and its Comprehensive Catastrophic Liability Policy for personal injuries provide coverage for injuries caused by an "occurrence." Both define an occurrence as an "accident * * * which results in bodily [or personal] injury * * * neither expected nor intended from the standpoint of the insured."

### A. *Intentional Act or Injury?*

Interpreting the meaning of "occurrence," the Appellate Division stated that "coverage will not be provided for intended results, but will be provided for the unintended and unforeseen results of an intentional act." 248 *N.J.Super.* at 465, 591 *A.*2d 677. Applied to this case, the court stated that "[a]lthough allegations of improper inducement of early retirement based upon age discrimination may be deemed intentional, resultant emotional distress * * * may well have been neither intended nor expected. * * * [S]uch an intent cannot be presumed." *Id.* at 465–66, 591 *A.*2d 677. The court therefore remanded the matter to the Law Division for a "determination [of] whether or not SL intended or expected to inflict bodily (*i.e.* emotional) injury upon Whitcomb." *Id.* at 467, 591 *A.*2d 677.

We agree with the Appellate Division's emphasis on the insured's intent to cause the injury rather than on its intent to commit the act that resulted in the injury. In *Voorhees,* we held that "the accidental nature of an occurrence is determined by analyzing whether the alleged wrongdoer intended or expected to cause an injury[,]" notwithstanding the intentional nature of the precipitating action. 128 *N.J.* at 183, 607 *A.*2d 1255. In that case, an "occurrence" was defined simply as an "accident." In this case, the policies' explicit definition of "accident" as that which results in *"injury * * * neither expected nor intended"* further justifies our focus on the accidental nature of the injury, rather than on the act. We thus decline to follow *John's Cocktail Lounge v. North River Ins. Co.,* 235 *N.J.Super.* 536, 563 *A.*2d 473 (1989), in which the

Appellate Division concluded that the intentional nature of the employer's discharge precluded finding an accidental occurrence, and found irrelevant the employer's intent to *injure* the fired employee. *Id.* at 542, 563 *A.*2d 473.

. B. *Was There a General Intent to Injure?*

To determine whether an injury was intended, we must first clarify the counts for which insurance coverage might be available. As discussed above, *supra* at 197–198, 607 *A.*2d at 1271, coverage is not available for liability as a result of SL Industries' violations of the ADEA. Whitcomb's third count, however, alleged that Instone and SL Industries' discriminatory inducement of his early retirement constituted common-law fraud. Thus, the issue is whether SL Industries intended or expected to injure Whitcomb by fraudulently inducing his early retirement.

Courts generally have held that although the insurer must defend an insured who is accused of reckless, negligent, or innocent misrepresentations, no defense is required when the insured is accused of intentional misrepresentations. An intent to misrepresent is sufficient to presume an intent to injure. *American States Ins. Co. v. Cooper,* 518 *So.*2d 708, 710 (Ala. 1987); *see also International Ins. v. West Am. Ins.,* 208 *Cal.App.*3d 117, 255 *Cal.Rptr.* 912, 917–18 (1989) (allegation of negligent misrepresentation constitutes occurrence, implying that intentional misrepresentations do not); *cf. Universal Underwriters v. Youngblood,* 549 *So.*2d 76, 78 (Ala.1989) (holding that claims of negligent and innocent or reckless misrepresentation are sufficient basis for requiring insurer to defend; and indicating that there would probably be no duty to defend with regard to allegations of intentional fraud).

Under New Jersey law, the legal elements of fraud include " 'a material representation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment.' " *Bonnco Petrol v. Epstein,* 115 *N.J.* 599,

609, 560 *A.*2d 655 (1989) (quoting *Jewish Center of Sussex County v. Whale,* 86 *N.J.* 619, 624–25, 432 *A.*2d 521 (1981)). Whitcomb's complaint stated that "Instone and SL intended that Mr. Whitcomb would rely upon Instone's false representation," and thus alleged intentional fraud. To prevail in the underlying action, plaintiff would have to show that SL Industries had had a subjective intent to induce reliance. We conclude that the intent element in fraud, consisting of the intent to induce reliance, constitutes a subjective intent to injure.

### C. *Was There a Specific Intent to Cause Emotional Distress?*

Having found that a valid claim of intentional fraud presupposes a subjective intent to injure, we confront a further question. The Court must decide whether *any* intent to injure will render the resulting injury intentional, whether the wrongdoer must intend the *specific* injury that results, or whether there is some middle ground between the two approaches. We note that in *Voorhees,* our companion case, we did not need to reach this question because the complaint's allegation of negligence presupposed that Voorhees did *not* have a subjective intent to injure. 128 *N.J.* at 185, 607 *A.*2d 1255.

Our courts have taken different approaches to the question of how specifically the insured must have intended the resulting injury. Employing the *"Lyons"* test some courts have held that a subjective intent to injure ends the inquiry and precludes coverage. Under that approach, if there is a subjective intent to injure then any injury that results from the action will be deemed "intentional," even if the injury is different from or greater than that intended. We deem this the *"Lyons"* test after the case for which the principle is most often cited. *See Tal v. Franklin Mut. Ins. Co.,* 172 *N.J.Super.* 112, 117–18, 410 *A.*2d 1194 (App.Div.1980) (even though defendant did not intend to kill victim in fight, intent to harm sufficient to trigger exclusion); *Oakes v. State Farm Mut. Ins.,* 137 *N.J.Super.* 365, 366, 349 *A.*2d 102 (App.Div.1975) (even though trial court spe-

cifically found that defendant did not intend to inflict type of injuries sustained, no coverage due to evidence of general intent to injure); *Lyons v. Hartford Ins. Group, supra,* 125 *N.J.Super.* 239, 246, 310 *A.*2d 485 (in *dictum,* court indicated that if injury was intended, no coverage even if actual injury differed from intended injury).

On the other hand, some courts have indicated that to preclude coverage if the injury that actually occurred was not a probable outcome of the wrongful act is unfair. In *Prudential Property & Casualty Ins. Co. v. Karlinski,* 251 *N.J.Super.* 457, 598 *A.*2d 918 (App.Div.1991), the court considered liability coverage for the insured, whose child had engaged in a schoolyard fight that broke his adversary's hip. After reviewing the long line of New Jersey cases on liability coverage for intentionally-caused injuries, the court held that "where the intentional act does not have an inherent probability of causing the degree of injury actually inflicted, a factual inquiry into actual intent of the actor to cause *that* injury is necessary." 251 *N.J.Super.* at 464, 598 *A.*2d 918 (emphasis added). In other words, the court held that under normal circumstances, when the result of an action conforms to that which one would predict, the demonstration of a subjective intent to injure is sufficient to preclude coverage without further inquiry into the intent to cause the actual injury that resulted. However, in those circumstances in which the facts indicate that the acts in which the insured engaged were unlikely to result in the degree or type of injury that in fact occurred, an inquiry into the subjective intent to cause the resulting injury is in order.

A third approach is even more likely to lead to coverage. In *Hanover Ins. Group v. Cameron,* 122 *N.J.Super.* 51, 298 *A.*2d 715 (Ch.Div.1973), the court rejected the insurance company's argument that to preclude coverage only the intent to harm need be demonstrated. The court indicated that "intent" would only be found when the actual consequences that resulted from

the act were intended, or when the actor was substantially certain they would result. *Id.* at 59–61, 298 *A*.2d 715.

To determine which approach to adopt, we refer to the general principles underlying the interpretation of insurance-policy provisions involving intentional conduct. Our goal is to interpret the insurance provisions in light of the insured's objectively-reasonable expectations. We noted in *Voorhees* that we must attempt to reconcile two goals: that of deterring intentional wrongdoing by precluding insurance indemnification, and that of providing victims with compensation to the extent that compensation will not interfere with deterring injurious behavior. 128 *N.J.* at 180–181, 183, 607 *A*.2d 1255.

The *Lyons* test, foreclosing coverage whenever there is either an intent to injure or an expectation of injury, precludes coverage in some cases in which an insured could reasonably expect coverage. When the injury caused significantly exceeds the injury intended or expected and is an improbable consequence of the wrongful act that caused it, then it is hard to characterize the injury as truly "intentional." The injury, from the standpoint of the insured, is "accidental," and could thus be deemed an occurrence. Moreover, if the tortfeasor did not intend or expect to cause the resulting harm, denying coverage will not deter the harmful conduct. In that case, there is no policy justification for denying the victim the possibility of additional compensation. As the *Karlinski* court noted, precluding coverage "even if the actual harm far exceed[s] the consequences which might reasonably be expected by the insured * * * * diminishes the injured party's realistic possibility of recovery more than it impacts upon the insured tortfeasor." 251 *N.J.Super.* at 462, 598 *A*.2d 918.

On the other hand, an approach allowing coverage whenever the adverse consequences intended by the tortfeasor did not precisely match the actual consequences of their wrongful actions undermines the basic policy against indemnifying wrongdoers.

We believe the *Karlinski* test presents the most reasonable approach. It conforms to an insured's objectively-reasonable expectations and provides the victim with the greatest possibility of additional compensation consistent with the goal of deterring intentional wrongdoing. Assuming the wrongdoer subjectively intends or expects to cause some sort of injury, that intent will generally preclude coverage. If there is evidence that the extent of the injuries was improbable, however, then the court must inquire as to whether the insured subjectively intended or expected to cause that injury. Lacking that intent, the injury was "accidental" and coverage will be provided.

In the area of employment discrimination and unlawful discharges, courts have hesitated to find emotional distress and/or bodily injuries a "probable" outcome of wrongful behavior. As one article has noted:

[C]ourts may be unlikely to infer an intent to cause bodily injury in any but the most egregious wrongful termination or employment discrimination actions. Consequently, * * * the standard 'occurrence' requirement may not preclude coverage for these types of claims.

[Peer & Mallen *supra*, 54 *Defense Counsel J.* at 475.]

*See, e.g., Interco v. Mission Ins. Co.*, 808 *F.*2d 682, 685–86 (8th Cir.1987) (concluding that intent to cause severe emotional damage could not be inferred from insured's firing plaintiff).

Applying the doctrine developed thus far, we begin with an analysis of SL Industries' subjective intent to injure or expectation of injuring Whitcomb. As indicated above, *supra* at 209, 607 *A.*2d at 1277, a claim of intentional fraud presupposes a general subjective intent to injure. The trial court must then determine whether Whitcomb's emotional distress was a probable consequence of Instone's actions. If it was a probable outcome, SL Industries' general subjective intent to injure will preclude its obtaining coverage. If it was not a probable outcome, the court must determine whether Instone subjectively intended to cause Whitcomb's actual injuries.

We thus affirm so much of the Appellate Division judgment as remands the case for a determination of whether SL Industries intended to cause emotional distress.

### D. *Coverage for SL Industries' Vicarious Liability*

We note that the trial court may also need to address whether the insurance policies will cover SL Industries' vicarious liability for the fraudulent conduct of its Chief Executive Officer, Instone.

As one article indicated:

A common principle of insurance law is that intentional misconduct of an agent or other additional insured does not preclude coverage for a nonculpable insured that is vicariously liable for the wrong.

[Peer & Mallen, *supra*, 54 *Defense Counsel J.* at 476.]

A number of courts have applied that principle to allow coverage for an entity's vicarious liability for its members or employees as long as the insured entity did not actively participate in the wrongdoing, even when the employee's conduct itself was not covered. *See Dart Indus. v. Liberty Mut. Ins. Co.*, 484 *F.*2d 1295 (9th Cir.1973); *Western Casualty & Sur. Co. v. Aporang Mfg. Co.*, 197 *F.*2d 673 (5th Cir.1952); *Firemen's Fund Ins. Co. v. City of Turlock*, 170 *Cal.App.*3d 988, 216 *Cal.Rptr.* 796 (1985); *Malanga v. Manufacturers Casualty Ins. Co.*, 28 *N.J.* 220, 227, 146 *A.*2d 105 (1958). Those cases indicate that if the entity did not participate in the wrong-doing, then the actions and injuries were accidental occurrences from the entity's perspective.

If the court on remand finds that Instone's behavior was not covered, but that SL Industries was vicariously liable, it will have to assess both the provisions in the insurance policies governing coverage for vicarious liability and the extent of SL Industries' participation in the wrongdoing.

### V

Although the charge of "humiliation" resulting from SL Industries' alleged fraud may be covered by SL Industries'

personal-injury policy, the claims for statutory violations are not. In the event the fraud count is covered, we must address the extent to which American must reimburse SL Industries for its defense and settlement costs.

Few New Jersey cases address the question directly. In *City Council of Elizabeth v. Fumero*, 143 *N.J.Super.* 275, 362 *A.*2d 1279 (Law Div.1976), most of the claims alleged in the underlying complaint were not covered by the insurance policy. The insured had undertaken its own defense because the insurer's interests conflicted with the insured's. The court required the insurer to reimburse the insured for its defense of only the covered claim. *Id.* at 289, 362 *A.*2d 1279.

In contrast, in *Mt. Hope Inn v. Travelers Indem. Co.*, 157 *N.J.Super.* 431, 384 *A.*2d 1159 (Law Div.1978), the court stated, "If the claim is stated in two conflicting theories, one which requires coverage and the other which does not, the carrier has no choice. It must defend." Although the case does not explicitly address the question of apportioning costs, by assigning the duty to defend the court may have presumed implicitly that the insurer would pay all of the associated costs.

Plaintiffs rely heavily on *Dunne v. Fireman's Fund Am. Ins. Co.*, 69 *N.J.* 244, 353 *A.*2d 508 (1976), as support for the proposition that the insurance company must pay all costs of covered and non-covered claims. That case is inapposite. Although we did hold that the insurer had a duty to defend the entire action although only some of the allegations in the underlying complaint were covered, *id.* at 252, 353 *A.*2d 508, the Court noted that the duty to defend arose from a specific agreement between the insurer and insured in which they had expressly agreed to share defense costs. *Id.* at 246, 353 *A.*2d 508.

Given the paucity of germane precedent, we decide the issue as a matter of first impression. The general rule is that when the insurer has wrongfully refused to defend an action and is then required to reimburse the insured for its defense

costs, its duty to reimburse is limited to allegations covered under the policy, provided that the defense costs can be apportioned between covered and non-covered claims. *See E.E.O.C. v. Southern Publishing Co.*, 894 *F.*2d 785, 791 (5th Cir.1990); *Budd Co. v. Travelers Indem. Co.*, 820 *F.*2d 787, 790–91 (6th Cir.1987); *Insurance Co. of N. Am. v. Forty–Eight Insulations*, 633 *F.*2d 1212, 1224–25 (6th Cir.1980); *Burlington Drug Co. v. Royal Globe Ins. Co.*, 616 *F.Supp.* 481, 483–84 (D.C.Vt. 1985); *cf. Crist v. Insurance Co. of N. Am., supra*, 529 *F.Supp.* at 604–05 (holding that insurer should be given the opportunity to demonstrate whether defense costs for covered and non-covered claims are capable of apportionment). When the defense costs cannot be apportioned, the insurer must assume the cost of the defense for both covered and non-covered claims. *See Hogan v. Midland Nat'l Ins. Co.*, 3 *Cal.*3d 553, 91 *Cal.Rptr.* 153, 159, 476 *P.*2d 825 (1970); *Jostens v. CNA Ins./Continental Casualty Co.*, 403 *N.W.*2d 625, 631 (Minn. 1987); *National Steel Constr. Co. v. National Union Fire Ins. Co.*, 14 *Wash.App.* 573, 543 *P.*2d 642 (1975).

The rule is grounded in basic principles of contract law. In *Forty–Eight Insulations, supra,* the seminal case on the issue, the court noted:

> The duty to defend arises solely under contract. An insurer contracts to pay the entire cost of defending a claim * * * [within the policy, but] has not contracted to pay defense costs for occurrences which took place outside the policy * * *.

[633 *F.*2d at 1212.]

We believe that principle obligates the insurer to pay only those defense costs reasonably associated with claims covered under the policy.

Although we adopt the general rule favored by most jurisdictions, we note that our interpretation differs from that of a number of the courts that have applied it. Those courts presume that apportioning costs will be very difficult, and that the exception, requiring insurers to pay all of the defense costs if

they are not capable of apportionment, thus applies more often than the rule requiring apportionment. *See, e.g., Crist, supra,* 529 *F.Supp.* at 605 ("Typically, * * * * an apportionment of expenses * * * is nearly impossible."). Those courts implicitly require a greater degree of certainty in determining the allocability of costs than is either necessary or fair. We recognize that insurers, insureds, and courts will rarely be able to determine the allocation of defense costs with scientific certainty. However, the lack of scientific certainty does not justify imposing all of the costs on the insurer by default. The legal system frequently resolves issues involving considerable uncertainty. We presume that the insurer and insured can negotiate a satisfactory settlement that fairly apportions the defense costs. When they are unable to agree, we likewise presume that our courts will be able to analyze the allegations in the complaint in light of the coverage of the policy to arrive at a fair division of costs.

 We thus affirm the Appellate Division's holding that

[t]o the extent the settlement was based in part on the * * * [common-law count for intentionally fraudulent misrepresentation] and to the extent that the emotional injury portion of damages under such count was considered in the settlement, an appropriate allocation of coverage and defense costs for such liability must be made.

[248 *N.J.Super.* at 467, 591 *A.2d* 677.]

Consistent with our determination that American should not be liable for the defense costs incurred before they were notified of the facts triggering coverage, *supra* at 201, 607 *A.*2d at 1273, the trial court also must apportion between costs expended before and after notification.

## VI

We affirm the judgment of the Appellate Division as modified and remand to the Law Division for further proceedings consistent with this opinion.

CLIFFORD, J. dissenting.

The Court holds that Whitcomb's charge of "humiliation" resulting from SL Industries' alleged fraud triggered defendant American Motorists Insurance Company's duty to defend. The fraud count in Whitcomb's complaint charged SL Industries' chief executive officer, John Instone, with conveying to Whitcomb, on behalf of their common employer, false representations that would induce Whitcomb to take early retirement, which, in reliance on those representations and to his detriment, he did.

The Comprehensive Catastrophe Liability Policy in this case, unlike the homeowner's policy in *Voorhees v. Preferred Mutual Insurance Co.*, 128 *N.J.* 165, 607 *A.*2d 1255 (1992), decided this day, protects the insured from liability for personal injuries, including "injury arising out of * * * humiliation." The liability, however, must arise out of an "occurrence," defined as "an accident."

As in *Voorhees*, I do not view the operative conduct—here, Instone's false representation to Whitcomb that his position of Group Vice–President was going to be eliminated—as in any sense amounting to an "accident." Whatever that word means in the context of liability insurance coverage, see 7A J.A. Appleman, *Insurance Law and Practice* § 4492, at 14–19 (Berdal ed. 1979), it cannot include the intentional stringing-along of the insured's fraud victim. The events alleged here do not come close to the basic definition of "accident" as "anything that happens or is the result of that which is unanticipated and takes place without the insured's foresight or anticipation," Appleman, *supra*, § 4492 at 17 (footnote omitted), or as "an undesigned, sudden, and unexpected event * * *." *Ibid.* My view on the meaning of "accident" coincides with that set forth in Judge Deighan's dissent in *Voorhees v. Preferred Mutual Insurance Co.*, 246 *N.J.Super.* 564, 581, 588–89, 588 *A.*2d 417 (App.Div.1992). Unable to improve on Judge Deighan's correct statement of the law, I adopt it in full.

I would reverse the judgment of the Appellate Division and reinstate the judgment of the Law Division.

*For affirmance and remandment*—Chief Justice WILENTZ; and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For reversal and reinstatement*—Justice CLIFFORD—1.