483 S.E.2d 228 (1997)
199 W.Va. 99
STATE BANCORP, INC., Bruceton Bank, Ronald D. Fike and Paul Thomas, Plaintiffs Below, Appellees,
v.
UNITED STATES FIDELITY AND GUARANTY INSURANCE COMPANY, Defendant Below, Appellant,
Aetna Casualty & Surety Company, Defendant Below, Appellee.
STATE BANCORP, INC., Bruceton Bank, Ronald D. Fike and Paul Thomas, Plaintiffs Below, Appellees,
v.
UNITED STATES FIDELITY AND GUARANTY INSURANCE COMPANY, Defendant Below, Appellee
Aetna Casualty & Surety Company, Defendant Below, Appellant,
Nos. 23302, 23303.
Supreme Court of Appeals of West Virginia.
Submitted September 18, 1996.
Rehearing Denied February 28, 1997.
Filed as Modified February 28, 1997.
*229 *230 Harry M. Rubenstein, Kay, Casto, Chaney, Love & Wise, Morgantown, John R. Hoblitzell, Kay, Casto, Chaney, Love & Wise, Charleston, for State Bancorp, Inc., Bruceton Bank, Ronald D. Fike and Paul Thomas.
James D. McQueen, Jr., Jeffrey C. Dunham, McQueen & Brown, L.C., Charleston, for USF & G.
Roslyn C. Payne, Brown & Levicoff, Beckley, Avrum Levicoff, Brown & Levicoff, Pittsburgh, PA, for Aetna Casualty & Surety Company.
PER CURIAM:
The appellants, United States Fidelity and Guaranty Insurance Company (hereinafter "USF & G") and Aetna Casualty & Surety Company (hereinafter "Aetna"), appeal the July 31, 1995 non-jury order of the Circuit Court of Monongalia County which entered a declaratory judgment in favor of the appellees, State Bancorp, Inc., Bruceton Bank, Ronald Fike and Paul Thomas.[1] The circuit court stated in the July 31, 1995 order that USF & G and Aetna had a duty to defend the appellees in an underlying lender liability action and, thus, ordered USF & G and Aetna to reimburse the appellees $50,000.00 on a quantum meruit basis for expenses incurred in defending the underlying case and for attorney fees for bringing the declaratory judgment action along with post-judgment interest.[2] For reasons explained below we[3] reverse the July 31, 1995 order of the circuit court and remand, in part, this case to the circuit court for further proceedings consistent with this opinion.

I

BACKGROUND FACTS

The Underlying Lawsuit
In 1988 Barbara Tyman applied to Bruceton Bank for a $75,000.00 loan through Ronald Fike, the Vice President of Loans, in order to develop certain real estate located in Monongalia County. This real estate, which was owned by Mrs. Tyman and her husband, Richard, consisted of a four-acre tract upon which their house was located and an additional two-acre tract. Mrs. Tyman's loan request was initially denied on the basis of insufficient income and slow credit history.
Subsequently, Mrs. Tyman reapplied for a loan. She stated that Paul Thomas, the President of Bruceton Bank, personally approved her loan in the amount of $20,000.00. The loan was secured by a deed of trust on the Tymans' Monongalia property. According to Mrs. Tyman, Bruceton Bank orally promised to loan her an additional $75,000.00 at a later date. However, instead of loaning her $75,000.00 as allegedly promised, Bruceton Bank loaned Mrs. Tyman an additional $5,000.00 which was also secured by a deed of trust on her Monongalia property.
In the fall of 1988 when the Tymans failed to make payments on the original loan, Bruceton Bank notified the Tymans of its intent to foreclose on their Monongalia property on December 1, 1988. Subsequently, Bruceton Bank noticed a foreclosure sale for January 4, 1989. Thereafter, the Tymans filed a petition for protection under Chapter 13 of the Bankruptcy Code and the foreclosure proceeding was stayed.
*231 Bruceton Bank filed a motion for relief from the bankruptcy stay, requesting that it be able to proceed with the foreclosure. The Tymans alleged that in October of 1990, the Bank's attorney, Keith Pappas, wrote a letter to the bankruptcy trustee, Robert Durnal, asking him to abandon the Tymans' property to Bruceton Bank. The Tymans stated that Pappas' letter contained false and malicious statements which discredited them with the bankruptcy court.
In the fall of 1990, at a bankruptcy hearing, the Tymans introduced an appraisal which valued the four-acre tract with their home at $285,000.00 and the two-acre tract at $98,000.00. Bruceton Bank presented an appraisal valuing the house and four acres at $100,000.00. The bankruptcy court adopted Bruceton Bank's appraisal and permitted Bruceton Bank to proceed with the foreclosure sale.
The Tymans stated that Bruceton Bank purchased all senior deeds of trust which were incumbering their property. Additionally, the Tymans asserted that Bruceton Bank's attorney, Keith Pappas, became the substitute trustee on the Tymans' deed of trust.
On November 5, 1990, Keith Pappas held a trustee's sale at which Bruceton Bank purchased the property through Paul Thomas, the President of the bank, at a price of $140,000.00. On January 23, 1992, Bruceton Bank sold the Tymans' property to Keith Pappas for $87,000.00 which Pappas financed with a deed of trust from Bruceton Bank for $120,000.00. This deed of trust was renewed in November of 1991 for up to $150,000.00.
Based on the above facts, the Tymans filed a complaint against the appellees alleging four counts. Count one alleged the tort of outrage. The Tymans stated that the appellees deliberately made a bad loan, forced them into bankruptcy and misled the bankruptcy court for the purpose of acquiring their property. Furthermore, the Tymans stated that the appellees acted outrageously by selling the property to Pappas at a price below the fair market value in violation of the state banking laws.
Count two alleged breach of contract. The Tymans asserted that the Bank breached the oral contract to lend them up to $75,000.00.
Count three was based upon the tort of civil conspiracy. The facts supporting count one also supported this count. The Tymans asserted that the appellees conspired to gain control over their property. The Tymans further asserted that Pappas' letter to the bankruptcy trustee was evidence of the conspiracy.
Count four alleged the violation of state banking laws such as making a false statement in the Pappas' letter to the bankruptcy trustee in violation of W. Va.Code, 31A-8-9 [1969].[4] The Tymans' also alleged that the appellees violated W. Va.Code, 31A-8-3 [1969] and W. Va.Code, 31A-8-10 [1969] by making a loan to Keith Pappas to purchase the Tymans' property and by giving Paul Thomas any indirect interest in the purchase of the property.[5]
The Tymans stated in their complaint that they suffered severe emotional distress, lost their home and property, were forced into bankruptcy, had their credit ruined and lost expected profits from the development of their Monongalia property. Ultimately, the action filed by the Tymans against the appellees was dismissed.

The Applicable Insurance Policies
Aetna insured Bruceton Bank under a Commercial General Liability Coverage (hereinafter "CGL") policy and a Commercial Excess Liability (Umbrella) Insurance policy *232 (hereinafter "excess policy") from October 23, 1988 to October 23, 1989. USF & G insured Bruceton Bank under a CGL policy and a Commercial Umbrella Liability Coverage policy (hereinafter "umbrella coverage") from October 23, 1989 to October 23, 1990.[6]
Both Aetna's and USF & G's CGL policies provide two types of coverage: coverage A and coverage B. Coverage A provides that the insurer will pay those sums the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" which is caused by an "occurrence" during the policy period. An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Coverage B provides that the insurer will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" as those terms are defined in the policies. Additionally, Aetna provided coverage under an excess policy, and USF & G provided coverage under an umbrella coverage policy. This Court will more fully explain the provisions of coverages A and B of the CGL policies, Aetna's excess policy, and USF & G's umbrella coverage policy when we discuss Aetna's and USF & G's duty to defend pursuant to these policies.

The Current Action
On January 19, 1993, the appellees filed a declaratory judgment action in the Circuit Court of Monongalia County against Aetna and USF & G seeking a determination "that standard commercial general liability and excess policies of insurance issued by Aetna and by USF & G afforded coverage and/or required the insurers to defend [the appellees] in an underlying `lender liability' action brought in the ..." circuit court by Barbara and Richard Tyman. As stated, the underlying action filed by the Tymans had been dismissed. Thus, the only issue presented to the circuit court in the declaratory judgment action was whether Aetna and USF & G would be required to reimburse any of the defense costs incurred by the appellees.
The circuit court examined whether the allegations contained in the Tymans' complaint "were reasonably susceptible of an interpretation that the claim may be covered by the insurance policies[,]" and found that "the alleged breach of contract constituted an `occurrence' as contemplated in the insurance policies, and thereby falls within the coverage of the insurance policies[.]" The circuit court also found that the "allegations contained in the Tyman action complaint occurred within the USF & G and Aetna policy periods[.]" Thus, as previously indicated, the circuit court concluded that both USF & G and Aetna had a duty to defend the appellees in the underlying action. It is this conclusion of the circuit court that Aetna and USF & G now appeal.

II

Standard of Review
At the outset, we note that "[a] circuit court's entry of a declaratory judgment is reviewed de novo." Syl. pt. 3, Cox v. Amick, 195 W.Va. 608, 466 S.E.2d 459 (1995). See also syl. pt. 1, Randolph County Board of Educ. v. Adams, 196 W.Va. 9, 467 S.E.2d 150 (1995). However, any determinations of fact made by the circuit court are reviewed *233 pursuant to the clearly erroneous standard. Cox, 195 W.Va. at 612, 466 S.E.2d at 463.

The Duty to Defend
In Horace Mann Ins. Co. v. Leeber, 180 W.Va. 375, 378, 376 S.E.2d 581, 584 (1988), this Court explained the following general principles which should guide a court in making its determination of whether an insurer has a duty to defend pursuant to the terms in its policy:
First, any ambiguity in the language of an insurance policy is to be construed liberally in favor of the insured, as the policy was prepared exclusively by the insurer. This principle applies to policy language on the insurer's duty to defend the insured, as well as to policy language on the insurer's duty to pay. Second, the duty of an insurer to defend an insured is generally broader than the obligation to provide coverage, that is, to pay a third party or to indemnify the insured, in light of the language in the typical liability policy which obligates the insurer to defend even though the suit is groundless, false or fraudulent. Third, an insurer's duty to defend is normally tested by whether the allegations in the complaint against the insured are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policy. Consequently, there is no requirement that the facts alleged in the complaint against the insured specifically and unequivocally delineate a claim which, if proved, would be within the insurance coverage.
(footnote omitted). See also Silk v. Flat Top Construction, Inc., 192 W.Va. 522, 453 S.E.2d 356 (1994); Aetna Casualty & Surety Co. v. Pitrolo, 176 W.Va. 190, 342 S.E.2d 156 (1986). (This case originally set forth the above general principles and is a good source for case law and treatises which more fully explain the above principles).
Additionally, "if part of the claims against an insured fall within the coverage of a liability insurance policy and part do not, the insurer must defend all of the claims, although it might eventually be required to pay only some of the claims." Leeber, 180 W.Va. at 378, 376 S.E.2d at 584 (citing Donnelly v. Transportation Insurance Co., 589 F.2d 761, 765 (4th Cir.1978), as amended on denial of rehearing, Jan. 30, 1979). However, "a liability insurer need not defend a case against the insured if the alleged conduct is entirely foreign to the risk insured against." Id.
This Court is also mindful that "`"[w]here the provisions of an insurance policy contract are clear and unambiguous they are not subject to judicial construction or interpretation, but full effect will be given to the plain meaning intended." Syllabus, Keffer v. Prudential Ins. Co., 153 W.Va. 813, 172 S.E.2d 714 (1970).' Syl. pt. 1, Russell v. State Auto. Mut. Ins. Co., 188 W.Va. 81, 422 S.E.2d 803 (1992)." Syl. pt. 1, Miller v. Lemon, 194 W.Va. 129,459 S.E.2d 406 (1995). See also syl. pt. 4, Cox, supra. "`"Language in an insurance policy should be given its plain, ordinary meaning." Syl. Pt. 1, Soliva v. Shand, Morahan & Co., 176 W.Va. 430, 345 S.E.2d 33 (1986).' Syl. pt. 2, Russell v. State Auto. Mut. Ins. Co., 188 W.Va. 81, 422 S.E.2d 803 (1992)." Syl. pt. 2, Miller, supra. See also syl. pt. 5, Cox, supra.
However, if the language in an insurance policy is ambiguous, then the doctrine of reasonable expectations applies: "With respect to insurance contracts, the doctrine of reasonable expectations is that the objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." Syl. pt. 8, National Mutual Ins. Co. v. McMahon & Sons, Inc., 177 W.Va. 734, 356 S.E.2d 488 (1987). See also Silk, 192 W.Va. at 526 n. 4, 453 S.E.2d at 360 n. 4 (The doctrine of reasonable expectations only applies in West Virginia when the policy language in ambiguous). Lastly, "`[w]here the policy language involved is exclusionary, it will be strictly construed against the insurer in order that the purpose of providing indemnity not be defeated.' Syl. pt. 5, National Mutual Ins. Co. v. McMahon & Sons, Inc., 177 W.Va. 734, 356 S.E.2d 488 (1987)." Syl. pt. 1, Marshall v. Fair, 187 W.Va. 109, 416 S.E.2d 67 (1992).
*234 With the above principles in mind, we must examine the provisions of Aetna's and USF & G's coverages A and B of the CGL policies, Aetna's excess policy, and USF & G's umbrella coverage policy to determine whether any of the allegations in the Tymans' complaint are "reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policy." Leeber, 180 W.Va. at 378, 376 S.E.2d at 584. At the outset, we note that as often happens in cases that require a detailed reading of an insurance policy, the parties are forced to articulate in an abbreviated fashion extensive policy provisions of a lengthy insurance policy which are not easily susceptible to being explained to the reader of a brief. In the case before us, not only are there two lengthy insurance policies which must be discussed, but, there are also several different causes of action which must be examined in order for this Court to determine whether the insurance policies at issue potentially provided coverage.

Coverage A
Coverage A of the CGL policies provides that the insurers will pay those sums the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" which is caused by an "occurrence."[7] Thus, an examination of the Tymans' complaint must be made to ascertain if any of the allegations are susceptible of an interpretation that the Tymans suffered "bodily injury" or "property damage" caused by an "occurrence."
As previously indicated, the Tymans' complaint alleged the tort of outrage, breach of contract, the tort of civil conspiracy and violation of the state banking laws. The circuit court held that the allegation of breach of contract for not loaning the Tymans up to $75,000.00 was an "occurrence" "as contemplated in the insurance policies, and thereby falls within the coverage of the insurance policies[.]" We disagree.
An "occurrence" is defined in the CGL policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The word "accident" is not defined in the policies. Ordinarily, "accident" is defined as "an event occurring by chance or arising from unknown causes[.]" Webster's New Collegiate Dictionary 7 (1981). As one court has explained,
[a]n `accident' generally means an unusual, unexpected and unforeseen event.... An accident is never present when a deliberate act is performed unless some additional unexpected, independent and unforeseen happening occurs which produces the damage.... To be an accident, both the means and the result must be unforeseen, involuntary, unexpected, and unusual.
Harrison Plumbing & Heating, Inc. v. New Hampshire Insurance Group, 37 Wash.App. 621, 681 P.2d 875, 878 (1984) (citations omitted). See also Travelers Ins. Companies v. P.C. Quote, Inc., 211 Ill.App.3d 719, 156 Ill. Dec. 138, 143, 570 N.E.2d 614, 619 (1991) ("An accident is defined as `an unforeseen occurrence of untoward or disastrous character' or `an undesigned sudden or unexpected event.'" (citation omitted)); Arco Industries Corp. v. American Motorists Ins. Co., 448 Mich. 395, 531 N.W.2d 168, 173 (1995).
As some courts have recognized, a breach of contract which causes "bodily injury" or "property damage" is not an event that occurs by chance or arises from unknown causes, and, therefore, is not an "occurrence" as that word is defined in Aetna's and USF & G's CGL policies. See Reliance Ins. Co. v. Gary C. Wyatt, Inc., 540 So.2d 688 (Ala.1988) (The insurer had no duty to defend because the breach of contract was not an "occurrence" resulting in bodily injury or property damage under the definitions within the general liability insurance policy); Kema Steel, Inc. v. Home Insurance Co., 153 Ariz. 315, 736 P.2d 798 (Ct.App.1986) (An employer's failure to procure medical insurance for its employee is a breach of contract claim and is not covered by the employer's comprehensive general liability coverage policy which provides coverage for bodily injury caused by an occurrence); Hawaiian Holiday Macadamia Nut Co. v. Industrial Indemnity Co., 76 Hawai'i 166, 872 P.2d 230 (1994) (The underlying suit for breach of contract and fraud did not trigger an insurer's *235 duty to defend under a comprehensive general liability insurance policy which provided coverage for property damage caused by an occurrence); Travelers Ins. Companies, supra (The breach of contract allegations in the complaint are not "occurrences" under the general liability coverage of the policy); Pyles v. Pennsylvania Manufacturers' Association Ins. Co., 90 Md.App. 320, 600 A.2d 1174, 1177 (1992), cert. denied, 326 Md. 662, 607 A.2d 7(Md.) (This case states that a number of courts in other jurisdictions have held that "an insured who has incurred liability in an earlier action as a result of breach of contract ... is not covered under a general business liability insurance policy which extends to liability for damages due to property damage or bodily injury."); Harrison Plumbing & Heating, Inc., supra (A breach of contract is not an occurrence; thus, the insurer had no duty to defend under the provisions of the comprehensive general liability policy). Thus, the breach of contract allegation in the Tymans' complaint is entirely foreign to the risk insured against in coverage A of Aetna's and USF & G's CGL policies. See Leeber, 180 W.Va. at 378, 376 S.E.2d at 584 ("[A] liability insurer need not defend a case against the insured if the alleged conduct is entirely foreign to the risk insured against."). The circuit court, therefore, erred in concluding that Aetna and USF & G had a duty to defend the appellees on the basis that the breach of contract allegation was potentially covered under coverage A of the CGL policies.[8]
Likewise, we find the remaining counts in the Tymans' complaint, the tort of outrage, the tort of civil conspiracy, and the violation of state banking laws, make allegations entirely foreign to the risk insured against in coverage A of Aetna's and USF & G's CGL policies. See Leeber, supra. The common theme of these counts is that the appellees intentionally engaged in an outrageous conspiracy or scheme to defraud the Tymans out of their property. As we previously explained, the Tymans' allege that the scheme began when the appellees deliberately made a bad loan to them "contrary to accepted credit and banking standards, ... forcing them into bankruptcy and misleading the bankruptcy court for the purpose of acquiring... [their] property[.]" The Tymans further allege that after the appellees knowingly made bad loans to them, the appellees conspired with their attorney, Keith Pappas, to ensure that the Tymans' property would be sold far below the fair market value at the foreclosure sale. Moreover, the Tymans state that the appellees then deliberately sold their property to Mr. Pappas "far below the fair market value, and less than the ... [appellee Bruceton Bank] paid for it at the foreclosure sale, so that ... [appellee] Paul Thomas [the President of Bruceton Bank] could develop the property for his own personal gain, in violation of state banking laws[.]"
As indicated above, the Tymans asserted the following three counts in their complaint: the tort of outrage, the tort of civil conspiracy, and the violation of state banking laws. These three counts are rooted in the Tymans' allegation throughout their complaint that the appellees engaged in an intentional, outrageous scheme with Mr. Pappas so that the appellee, Paul Thomas, could gain control of the Tymans' property for his own personal gain.
As indicated above, the definition of an "occurrence" does not include actions which are intended by the insured. See La-Fever v. Whitely, 613 So.2d 1007 (La.Ct.App. 1992), writ denied by 614 So.2d 64(La.) (Bodily injury sustained from a fight did not arise out of an "occurrence" because the conduct in the fight was intentional); Fibreboard Corp. v. Hartford Accident and Indemnity Co., 16 Cal.App.4th 492, 20 Cal.Rptr.2d 376, 387 (1993) ("[T]here is a conscious, decisionmaking element that takes civil conspiracies out *236 of the range of behavior encompassed within the meaning of an `occurrence.'"). Moreover, coverage A expressly excludes intentional acts from coverage: "This insurance does not apply to ... `[b]odily injury' or `property damage' expected or intended from the standpoint of the insured."
Clearly, the facts alleged in the complaint which form the basis of the tort of outrage, tort of civil conspiracy, and violation of state banking laws counts are intentional acts of the insured. Thus, we conclude that the Tymans' allegation of the intentional scheming by the appellees to gain control of the Tymans' property is not reasonably susceptible of an interpretation that the claims are covered under the provisions of coverage A. See Leeber, supra.[9]

Coverage B
At the outset, we note that because the circuit court concluded that USF & G and Aetna had a duty to defend in the underlying action pursuant to the terms of Coverage A of the CGL policies, it did not reach the issue of whether the allegations in the Tymans' complaint were reasonably susceptible of an interpretation that the claim may be covered by the terms of Coverage B of the CGL policies.
Coverage B of Aetna's and USF & G's CGL policies provides that the insurers "will pay those sums that the insured becomes legally obligated to pay as damages because of `personal injury' or `advertising injury' to which this insurance applies." Under the provisions of coverage B, the "personal injury" or "advertising injury" must arise out of certain enumerated offenses committed by the insured.
More specifically,
`Advertising injury' means injury arising out of one or more of the following offenses:
a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
b. Oral or written publication of material that violates a person's right of privacy;
c. Misappropriation of advertising ideas or style of doing business; or
d. Infringement of copyright, title or slogan.
The appellees do not argue nor do we find that the Tymans' complaint alleges an "advertising injury" as it is defined in coverage B of the CGL policies.
The appellees argue that the Tymans allege that they suffered a "personal injury" as that term is defined in the CGL policies:
`Personal injury' means injury, other than `bodily injury', arising out of one or more of the following offenses:
a. False arrest, detention or imprisonment;
b. Malicious prosecution;
c. Wrongful entry into, or eviction of a person from, a room, dwelling or premises that the person occupies;
d. Oral or written publication of material that slanders or libels a person or organization *237 or disparages a person's or organization's goods, products or services; or
e. Oral or written publication of material that violates a person's right of privacy[.]
The appellees maintain that the Tymans have accused them of committing the offenses described in "c." (wrongful eviction) and "d." (publication of material that slanders).
We first address the appellees' argument that the Tymans' complaint alleges that they suffered a "personal injury" caused by their "[w]rongful ... eviction." We note that even if the allegations in the Tymans' complaint could be interpreted as alleging that the Tymans suffered a "personal injury" as a result of their wrongful eviction from their property at the conclusion of the foreclosure proceeding brought by the appellees, Aetna's policy was not in effect when this eviction occurred. The Tymans' complaint indicates that the trustee's sale of the Tymans' property occurred on November 5, 1990. Aetna provided coverage from October 23,1988 to October 23,1989.
Coverage B of Aetna's CGL policy expressly states that "[t]his insurance applies to `personal injury' only if caused by an offense: ... [c]ommited ... during the policy period [.]" (emphasis added). Thus, it is the date when the offense occurs that triggers the coverage rather than the date of the injury. See General Accident Ins. Co. v. West American Ins. Co., 42 Cal.App.4th 95, 49 Cal.Rptr.2d 603, 606 (1996) ("`In the world of liability insurance, personal injury coverage applies to injury which arises out of the commission of certain enumerated acts or offenses.... Coverage thus is triggered by the offense, not the injury or damage which a plaintiff suffers.'" (citations omitted)). The alleged offense in this case would have occurred, at the earliest, on November 5, 1990, when the trustee sale took place. Thus, even if the allegations of the Tymans' complaint could reasonably be interpreted as a "personal injury" caused by the appellees in wrongfully evicting the Tymans from their property, Aetna's policy was not in effect when the offense occurred. Therefore, Aetna had no duty to defend under Coverage B of its CGL policy.
However, this Court is unclear as to when USF & G's policy was in effect.[10] Thus, this Court is unable to determine whether the alleged offense of wrongful eviction in the Tymans' complaint could have been "[c]ommitted ... during [USF & G's] policy period[.]" Therefore, we remand this issue to the circuit court. On remand, the circuit court must determine whether the alleged offense of wrongful eviction could have been committed during USF & G's policy period, and, if so, whether the allegations of personal injury arising out of the offense of wrongful eviction in the Tymans' complaint are reasonably susceptible of an *238 interpretation that they may be covered by the terms of Coverage B of USF & G's CGL policy which was then in effect. To be clear, we emphasize that if the circuit court determines that USF & G's policy was in effect when the alleged offense of wrongful eviction could have occurred, then it must examine the terms of coverage, including the exclusions, found in Coverage B of USF & G's CGL policy to determine whether USF & G had a duty to defend in the underlying action. As noted in this opinion, "the duty of an insurer to defend an insured is generally broader than the obligation to provide coverage[.]" Leeber, 180 W.Va. at 378, 376 S.E.2d at 584.
Next, we address whether the allegations in the complaint alleged that the Tymans have suffered a "personal injury" caused by the "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services[.]" The Tymans' complaint alleges that Mr. Pappas, Bruceton Bank's attorney, deliberately wrote a letter to the bankruptcy court in order to maliciously and falsely discredit the Tymans with the bankruptcy court. While this allegation may be interpreted as Mr. Pappas writing material that libels the Tymans, coverage B expressly excludes "personal injury" "[a]rising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity[.]" Therefore, we conclude that any "personal injury" inflicted by the appellees by the submission of the above letter was intentional and, is therefore, expressly excluded from coverage under both Aetna's and USF & G's CGL policies.

Aetna's Commercial Excess Liability (Umbrella) Policy
In addition to its CGL policy, Aetna also provided coverage under an excess policy. The excess policy expressly states: "We will pay on behalf of the insured the `ultimate net loss' in excess of the `applicable underlying limit' which the insured becomes legally obligated to pay as damages because of `bodily injury', `property damage', `personal injury' or `advertising injury' to which this insurance applies." Aetna maintains that if there is no coverage under the underlying CGL policy, then the language expressly states that there is no coverage under the excess policy. See syl. pt. 1, Miller, supra (When the provisions of an insurance policy are clear and unambiguous, then full effect will be given to the plain meaning intended). We agree. In the case before us, based on the language above, we conclude that because there is no potential coverage under the underlying CGL policy, there is no potential coverage for the appellees under Aetna's excess policy.[11]

USF & G's Commercial Umbrella Liability Coverage
USF & G provided to the appellees, in addition to the CGL coverage, umbrella coverage. USF & G's umbrella coverage provides excess coverage and extended liability coverage.

Excess Coverage
USF & G's excess coverage is very similar to Aetna's excess coverage in that it states that USF & G
will pay those sums, in excess of the amount payable under the terms of any `underlying insurance,' that the insured becomes legally obligated to pay as damages because of `injury' to which this insurance applies, provided that the `underlying insurance' also applies, or would apply but for the exhaustion of its applicable limits of insurance.
*239 We conclude, as we did in our discussion of Aetna's excess policy, that the language above is clear that if there is potential coverage under the underlying CGL policy, then there is potential coverage for the appellees under USF & G's excess coverage provision. However, as we have previously explained, we are uncertain as to whether the offense of wrongful eviction could have occurred during USF & G's policy period and as to whether the allegations of personal injury caused by the offense of wrongful eviction in the Tymans' complaint are reasonably susceptible of an interpretation of being covered by Coverage B of USF & G's CGL policy. Thus, we are unable to determine whether USF & G's excess coverage gives rise to a duty to defend.

Extended Liability Coverage
USF & G's umbrella coverage also provides extended liability coverage: "We will pay those sums that the insured becomes legally obligated to pay as damages because of `injury' to which this insurance applies. This insurance applies only to `injury' which occurs during the policy period. The `injury' must be caused by an `incident.'" (emphasis added). An "incident" is defined as:
a. With respect to `bodily injury' to persons other than your employees and `property damage,' an accident, including continuous or repeated exposure to substantially the same general harmful conditions;
b. With respect to `bodily injury' to your employees arising out of and in the cause of their employment by you, the accident or disease which causes the `bodily injury'; and
c. With respect to offenses committed by the insured resulting in `personal injury' or `advertising injury,' all such `injury' sustained by any one person or organization.
(emphasis added).
The ordinary meaning of the word "accident" as it is used in "a." and "b." above, is that it is "an event occurring by chance or arising from unknown causes[.]" Webster's New Collegiate Dictionary 7 (1981). As we concluded when discussing whether the Tymans' complaint alleged an "occurrence" which was defined as an "accident" in coverage A of the CGL policies, the Tymans' complaint does not allege any injuries caused by an "accident." Therefore, none of the injuries alleged in the Tymans' complaint were caused by an incident as it is defined in a. and b. above.
Furthermore, "incident" is defined in "c." as "personal injury" caused by an "offense." The "offenses" enumerated under the definitions of "personal injury" and "advertising injury" in USF & G's umbrella coverage are the same as those enumerated in coverage B of the CGL policies which we have previously discussed. See discussion of Coverage B, supra. Therefore, for the same reasons given in our discussion of USF & G's Coverage B of the CGL policies, we are unable to determine whether there is potentially coverage under this section of USF & G's extended liability coverage. The circuit court will have to address this issue on remand.

III
In conclusion, we find that none of the allegations in the Tymans' complaint are reasonably susceptible of an interpretation that the claim may be covered by the terms of Aetna's CGL policy or excess policy. Thus, we conclude the circuit court erred by holding that Aetna had a duty to defend the appellees.[12]
*240 Though this Court has concluded that none of the allegations in the Tymans' complaint are reasonably susceptible of an interpretation that the claim may be covered by Coverage A of USF & G's CGL policy, this Court is unable to determine whether the allegations in the Tymans' complaint are reasonably susceptible of an interpretation that they are covered under Coverage B of USF & G's CGL policy or under USF & G's umbrella coverage. More specifically, this Court is uncertain as to whether the alleged offense of wrongful eviction could have been committed when USF & G's CGL policy was in effect, and if so, whether any of the allegations of personal injury in the Tymans' complaint alleged to have been caused by the offense of wrongful eviction are reasonably susceptible to an interpretation of being covered by Coverage B of USF & G's CGL policy and umbrella coverage policy which were then in effect. Therefore, this Court is unable to determine whether USF & G had a duty to defend. Thus, this Court is remanding this issue to the circuit court. Accordingly, based upon all of the above, this Court reverses the July 31, 1995 order of the Circuit Court of Monongalia County and remands this case, in part, for further proceedings consistent with this opinion.[13]
Reversed and remanded, in part.
RECHT, Judge, sitting by temporary assignment when opinion was originally filed on December 13, 1996.
WORKMAN, C.J., and McHUGH, DAVIS and MAYNARD, JJ., participated in modified opinion after rehearing was denied.
STARCHER, J., deeming himself disqualified, did not participate in the decision of the modified opinion.
NOTES
[1] State Bancorp, Inc. is the holding company of Bruceton Bank. Paul Thomas is the President of Bruceton Bank and Ronald Fike is Vice President of Loans for Bruceton Bank.
[2] Aetna and USF & G submitted separate petitions for appeal. However, by orders dated February 7, 1996, this Court granted both petitions for appeal and consolidated these cases for purposes of this appeal.
[3] The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996 and continuing until further order of this Court.
[4] W. Va.Code, 31A-8-9 [1969] makes it a felony for an officer or employee of any financial institution to wilfully misapply funds, to defraud the institution or any person, or to make false statements with the intent to defraud a person.
[5] W. Va.Code, 31A-8-3 [1969] lists practices of a corporate financial institution that are forbidden and states that any person engaging in any of the listed practices shall be guilty of a misdemeanor. W. Va.Code, 31A-8-10 [1969] makes it unlawful for a financial institution and its officers and employees to not conform to the provisions of chapter 31A of the Code which regulates banks and banking. Additionally, W. Va.Code, 31A-8-10(b) [1969] makes it unlawful "[t]o obstruct or endeavor to obstruct a lawful examination of such institution by any lawfully authorized officer[.]"
[6] Bruceton Bank was also insured by Progressive Casualty Insurance Company under a Directors and Officers Liability Insurance Policy during the time period the Aetna and USF & G policies covered the Bank. The Progressive Policy contains a Lending Liability Endorsement which provides coverage for all loss arising out of any claim made by a borrower for an actual or alleged wrongful lending act relating to an extension of credit, refusal to extend credit or an agreement to extend credit to the borrower. The coverage provided by the Progressive policy is subject to a substantial deductible or self-insured retention. Both Aetna and USF & G assert that the Progressive Policy covers the Tymans' action.

The appellees assert that neither Aetna nor USF & G may argue that coverage should have been provided by Progressive because neither sought to join Progressive in the declaratory judgment action nor did they offer Progressive's policy into evidence in the court below. USF & G, however, asserts that it offered the Progressive Policy to the trial judge; however, the trial judge declined the offer. In any event, this Court declines to address whether the Progressive policy provides coverage given that this issue was not addressed by the circuit court in its July 31, 1995 order.
[7] Unless otherwise noted, the language in Aetna's and USF & G's CGL policies are the same.
[8] Coverage B states that an "advertising injury" arising out of a breach of contract is excluded from coverage. The appellees maintain that because damages from a breach of contract are expressly excluded from coverage B, but are not expressly excluded from coverage A, damages from a breach of contract are potentially covered by coverage A. We do not agree with the appellees' strained reading of Aetna's and USF & G's CGL policies. Coverage A and coverage B provide two distinctly different types of insurance coverage. Thus, a comparison between the two coverages on the breach of contract issue is misplaced.
[9] We recognize that courts have taken different approaches when determining how specifically the insured must have "intended" the resulting injury. For example, the Supreme Court of New Jersey noted the following three approaches: (1) if there is subjective intent to injure, then any injury resulting from the action of the insured will be deemed "intentional" even if injury was different from what was intended; (2) if the injury that occurred is not the probable outcome of the intentional act, then an inquiry into the actual intent of the insured to cause that injury is necessary; and (3) the insured must have intended the actual injury or must have been substantially certain that his or her actions would cause the injury. SL Industries, Inc. v. American Motorists Insurance Co., 128 N.J. 188, 607 A.2d 1266, 1277-78 (1992). Cf. Horace Mann Ins. Co. v. Leeber, 180 W.Va. 375, 376 S.E.2d 581 (1988) (This Court concluded that in sexual misconduct liability insurance cases where the insurance policy provides an "intentional injury" exclusion, the intent to injure will be inferred as a matter of law).

However, in the case before us, we need not delve into the type of intent that is necessary for the "intentional injury" exclusion to apply, because under any of the above tests, the "intentional injury" exclusion in the policies at issue in this case apply. It is clear that the Tymans' complaint alleges that the appellees specifically intended for their acts to injure the Tymans in the manner in which the Tymans were injured.
[10] The July 31, 1995 order of the circuit court and the parties' briefs on appeal all stated that USF & G provided coverage under its CGL policy from October 23, 1989 to October 23, 1990. Neither the order nor the briefs stated that this policy of USF & G's was renewed. Originally, based upon the above representations in the circuit court's order and the parties' briefs, this Court in a per curiam opinion which was filed on December 13, 1996, concluded that the alleged offense of wrongful eviction was not committed during USF & G's policy period, and thus, any personal injury caused by such offense was not covered by coverage B of USF & G's CGL policy.

However, the appellees in their petition for rehearing, which was filed in this Court on January 10, 1997, stated that the USF & G policy which was in effect from October 23, 1989 to October 23, 1990 was renewed continually until October 23, 1992. Though this Court denied the appellees' petition for rehearing, this Court has determined that the original opinion which was filed on December 13, 1996, should be modified to state that this case be remanded, in part, to the circuit court in order to determine whether USF & G's policy was in effect on November 5, 1990, and if so, whether USF & G has a duty to defend under Coverage B of its CGL policy.
As previously indicated, the circuit court found that the "allegations contained in the Tyman action complaint occurred within the USF & G and Aetna policy periods[.]" See p. 232, supra. However, the circuit court by concluding that USF & G and Aetna had a duty to defend pursuant to the terms of Coverage A of the CGL policies, did not reach the issue of whether the allegations contained in the Tymans' complaint were reasonably susceptible of an interpretation that they are covered by Coverage B of the CGL policies. Thus, the circuit court did not reach the specific issue of whether the allegation of wrongful eviction occurred within Aetna's and USF & G's policy periods.
[11] We recognize that the following language regarding the defense of claims or suits exists in Aetna's excess coverage provisions:

We will have the right and duty to defend any `suit' for damages which are payable under Coverages A or B (including damages wholly or partly within the `retained limit') but which are not payable by a policy of `underlying insurance', or any other available insurance, because:
(1) Such damages are not covered; or
(2) The `underlying insurance' has been exhausted by the payment of the claims.
(emphasis added). However, we find the above language inapplicable to the case before us because, as we have previously explained, we do not find that the Tymans' complaint alleges damages which are potentially payable under coverages A or B of Aetna's CGL policy.
[12] The appellees assert that both Aetna and USF & G breached their duty to the appellees by failing to investigate the Tymans' claim:

When a complaint is filed against an insured, an insurer must look beyond the bare allegations contained in the third party's pleadings and conduct a reasonable inquiry into the facts in order to ascertain whether the claims asserted may come within the scope of the coverage that the insurer is obligated to provide.
Syllabus, F & M Mut. Fire Ins. Co. of W. Va. v. Hutzler, 191 W.Va. 559, 447 S.E.2d 22 (1994). However, in the case before us, we could not find nor did the parties point to the existence of any facts outside of the complaint which could have been discovered had Aetna conducted a reasonable inquiry as required by Hutzler. Thus, even if Aetna did not conduct a reasonable inquiry as required by Hutzler, our holding on whether Aetna had a duty to defend based on the facts before us would not be affected. However, as explained above, we are unable to determine on the facts before us whether USF & G breached its duty to defend by failing to investigate the Tymans' complaint.
We note that notwithstanding USF & G's assertion that the holding in Hutzler should not be made retroactive, this Court in Leeber, 180 W.Va. at 378, 376 S.E.2d at 584, provided that "the duty of an insurer to defend an insured is generally broader than the obligation to provide coverage[.]" Thus, if USF & G's policy was in effect, then unless an exclusion is applicable or unless USF & G can show that the allegation of wrongful eviction in the Tymans' complaint is entirely foreign to the risk insured against, Leeber, 180 W.Va. at 378, 376 S.E.2d at 584, USF & G will have a duty to defend regardless of whether it conducted a reasonable inquiry into the facts.
[13] The appellees raised a cross-assignment of error regarding the circuit court's decision to not award them their total costs and expenses incurred in defending the Tymans' action. Because this Court has concluded that Aetna had no duty to defend the appellees and because this Court is unable to determine whether USF & G had a duty to defend the appellees, we will not address the cross-assignment of error.