**COMMUNITY ANTENNA SERVICES, INC., Plaintiff,**

v.

**WESTFIELD INSURANCE COMPANY, Defendant.**

**No. 6:01–0318.**

United States District Court, S.D. West Virginia, Parkersburg Division.

Nov. 21, 2001.

Robert W. Full, Goodwin & Goodwin, Parkersburg, for Plaintiff.

Brent K. Kesner, Kesner, Kesner & Bramble, Charleston, for Defendant.

### MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending are the parties' cross motions for summary judgment on the issue whether Defendant Westfield Insurance Company (Westfield) is required, under its policy of insurance issued to Plaintiff Community Antenna Services, Inc. (CAS), to provide a defense in an underlying civil action in Wood County, West Virginia. It is not. For reasons discussed below, Westfield's motion is **GRANTED** and CAS's motion is **DENIED.** Judgment will be entered in favor of Westfield.

### I. FACTUAL AND PROCEDURAL BACKGROUND

In October 2000 Charter Communications VI, LLC (Charter) brought a civil

action in Wood County Circuit Court against CAS for unlawful use and willful trespass on Charter's cable television facilities, tortious interference with Charter's customer service contracts, misrepresentation involving wrongful solicitation and switching of Charter's cable customers, and violations of the Cable Television Systems Act, W. Va.Code §§ 24D–1–1 *et seq.* and the Unfair Trade Practices Act, W. Va.Code §§ 47–11A–1 *et seq.* In its complaint Charter alleges:

> [O]n numerous occasions in the recent past, defendant [CAS] had disconnected Charter's cable service connections, without notice, to provide cable TV service to [CAS]'s customers, and in so doing, often left Charter's cable connections open and not properly capped, allowing signal "leakage" to occur, which diminishes the quality of Charter's signal and service throughout its system, and can lead to FCC sanctions, as well as loss of additional customers.

(Wood Co. Compl. ¶ 9.) Charter also alleges CAS was using its "test drop" and other facilities to help install or provide service to Charter customers. (*Id.* ¶ 10.) Additionally, Charter alleges CAS entered an agreement with the manager of Amber Hills Apartments in Parkersburg, West Virginia. In exchange for free cable service, the manager, together with CAS, would represent to the twenty-four tenants that CAS was the exclusive provider of cable TV service and provide that service, although Charter already provided cable service using interconnection boxes and interior wiring Charter had installed, which it owned and operated. (*Id.* ¶¶ 12, 13.)

CAS requested Westfield provide a defense under its commercial general liability (CGL) policy. Westfield refused, main-taining it has no duty to defend or indemnify CAS, or to afford coverage for Charter's asserted injuries. CAS then brought this action in state court for a determination of Westfield's duty under the policy. Westfield timely removed the action and CAS did not object. Westfield counterclaimed for a declaration of no duty to defend.

Following discovery, the parties cross-moved for summary judgment, agreeing no material facts are at issue and the Court can resolve the question as a matter of law. Briefing is complete and the matter ripe for disposition.[1]

## II. DISCUSSION

### A. *Summary Judgment Standard*

Our Court of Appeals has often stated the settled standard and shifting burdens governing the disposition of a motion for summary judgment:

> Rule 56(c) requires that the district court enter judgment against a party who, 'after adequate time for ... discovery fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' To prevail on a motion for summary judgment, the [movant] must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) it is entitled to judgment as a matter of law. In determining whether a genuine issue of material fact has been raised, we must construe all inferences in favor of the [nonmovant]. If, however, "the evidence is so one-sided that one party must prevail as a matter of law," we must affirm the grant of summary judgment in that party's favor. The

---

1. Defendant moved to supplement its reply, however, the issues on the cross-motions have been fully briefed. The Court DENIES the motion.

[nonmovant] "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." To survive [the motion], the [nonmovant] may not rest on [his] pleadings, but must demonstrate that specific, material facts exist that give rise to a genuine issue. As the *Anderson* Court explained, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff[.]" *Harleysville Mut. Ins. Co. v. Packer*, 60 F.3d 1116, 1119–20 (4th Cir.1995) (citations omitted); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.), *cert. denied*, 513 U.S. 813, 115 S.Ct. 67, 68, 130 L.Ed.2d 24 (1994); *see also Cabro Foods, Inc. v. Wells Fargo Armored Serv. Corp.*, 962 F.Supp. 75, 77 (S.D.W.Va.1997); *Spradling v. Blackburn*, 919 F.Supp. 969, 974 (S.D.W.Va.1996).

"At bottom, the district court must determine whether the party opposing the motion for summary judgment has presented genuinely disputed facts which remain to be tried. If not, the district court may resolve the legal questions between the parties as a matter of law and enter judgment accordingly." *Thompson Everett, Inc. v. National Cable Adver., L.P.* 57 F.3d 1317, 1323 (4th Cir.1995). It is through this analytical prism the Court evaluates the parties' motions.

## B. The Westfield Commercial General Liability Policy

The CGL policy provides two relevant coverages, A and B. Coverage A covers bodily injury and property damage liability; B covers personal and advertising injury liability. Westfield also provided CAS commercial umbrella coverage.

Coverage A covers bodily injury and property damage liability only if the injury or damage is caused by an "occurrence," which, by policy definition, means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The insurance does not apply to expected or intended injury, that is bodily injury or property damage "expected or intended from the standpoint of the insured."

Coverage B covers personal injury and advertising injury liability, which applies to an advertising injury "caused by an offense committed in the course of advertising your goods, products or services." The parties agree the relevant definition of "advertising injury" is an "injury arising out of . . . oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." Excluded is coverage for advertising injury:

(1) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

. . .

(3) Arising out of the wilful violation of a penal statute or ordinance committed by or with the consent of the insured[.]

The commercial umbrella policy covers damages in excess of the "retained limit" that the insured becomes legally obligated to pay because of personal injury or property damage to which the insurance applies. Again excluded is bodily injury or property damage expected or intended from the standpoint of the insured.

## C. Insurer's Duty to Defend

For Coverages A and B and the commercial umbrella coverage, the Westfield CGL policy coverage form provides:

We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "prop-

erty damage" ["personal injury" or "advertising injury"] [excess damages] to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

 The duty of an insurer to defend the insured is "generally broader than the obligation to provide coverage, that is to pay a third party or to indemnify the insured." [2] *Horace Mann Ins. Co. v. Leeber,* 180 W.Va. 375, 378, 376 S.E.2d 581, 584 (1988). The insurer's duty to defend is "normally tested by whether the allegations in the complaint against the insured are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policy." [3] *Id.* Because insurance policies are prepared solely by insurers, "any ambiguities in the language of insurance policies must be construed liberally in favor of the insured." *Aetna Cas. & Sur. Co. v. Pitrolo,* 176 W.Va. 190, 194, 342 S.E.2d 156, 160 (1986). As a result, where there is any question about an insurer's obligations under the policy, it must be "construed liberally in favor of an insured." *Id.* Additionally, "[w]here the policy language is exclusion-

ary, it will be strictly construed against the insurer in order that the purpose of providing indemnity not be defeated." Syl. pt. 1, *Marshall v. Fair,* 187 W.Va. 109, 416 S.E.2d 67 (1992)(citing syl. pt. 5, *National Mutual Ins. Co. v. McMahon & Sons, Inc.,* 177 W.Va. 734, 356 S.E.2d 488 (1987)).

 Where "part of the claims against an insured fall within the coverage of a liability insurance policy and part do not, the insurer must defend all of the claims, although it might eventually be required to pay only some of the claims." *Leeber,* 180 W.Va. at 378, 376 S.E.2d at 584 (citing *Donnelly v. Transportation Ins. Co.,* 589 F.2d 761, 765 (4th Cir.1978), *as amended on denial of rehr'g,* Jan. 30, 1979). "An insured's right to a defense will not be foreclosed unless such a result is inescapably necessary." *Id.* The test is whether the alleged conduct is "entirely foreign to the risk insured against," *id.,* or whether any of the allegations in the Charter complaint are "reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policy." *Leeber,* 180 W.Va. at 378, 376 S.E.2d at 584. Only if the conduct is necessarily foreign to the risk insured need the liability insurer not defend. With these principles in mind, the Court examines Defendant's duty to defend.

**2.** CAS argues Westfield is obligated to defend "even though the suit is groundless, false or fraudulent." (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 18) (citing *Aetna Cas. & Sur. Co. v. Pitrolo,* 176 W.Va. 190, 342 S.E.2d 156 (1986)). This extremely broad obligation to defend, however, "ordinarily arises by virtue of language in the ordinary liability policy that obligates the insurer to defend even though the suit is groundless, false or fraudulent." *Id.* 176 at 194, 342 S.E.2d at 160. The Westfield CGL policy contains no such language, but as it is not an issue here, the Court need not decide the breadth of coverage in the absence of such policy language.

**3.** Plaintiff proposes, without citation, there is some confusion whether the duty to defend is determined solely on the allegations of the underlying complaint or also on evidence developed. (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 16.) *Leeber* does not equivocate as to the normal test: examination of the complaint's allegations. For an alternative view, where certain allegations of the complaint are not clear, see *Health Care and Retirement Corp. of America v. St. Paul Fire & Marine Ins. Co.,* 621 F.Supp. 155 (S.D.W.Va. 1985) (Copenhaver, J.), discussed *infra* at II.D. Ambiguity of the allegations is not a problem in the instant case.

#### D. Westfield's Duty to Defend: Property Damage

In the instant action, CAS alleges Charter's allegations that CAS improperly terminated its cable connections and misrepresented itself as an exclusive cable provider are "reasonably susceptible to an interpretation the [activities] were unintentional or occurred accidentally, implicate the 'products-completed operations hazard' coverage [of the policy],[4] and are reasonably susceptible to an interpretation as alleging disparagement of Charter by Community," thus triggering Westfield's duty to defend. Westfield responds the underlying suit claims no damages for signal leakage; the signal is not tangible property; and the CGL policy does not cover intentional acts nor knowingly false misrepresentation. The Court considers these issues in turn.

As described above, in its complaint Charter alleges:

> [O]n numerous occasions in the recent past, defendant [CAS] had disconnected Charter's cable service connections, without notice, to provide cable TV service to [CAS]'s customers, and in so doing, often left Charter's cable connections open and not properly capped, allowing signal "leakage" to occur, which diminishes the quality of Charter's signal and service throughout its system, and can lead to FCC sanctions, as well as loss of additional customers.

(Wood Co. Compl. ¶ 9.) The Prayer for Relief in Charter's complaint requests "compensatory ... damages ... for violations of such statutes and for defendant's actions otherwise herein set forth[.]" (Compl., Prayer for Relief, C.) Not only is

signal leakage described, but it is alleged to cause specific damages. That Charter has not requested specific damages for signal leakage is not dispositive. *See* Fed. R.Civ.P. 54(c)(A party is not limited to the relief sought in the pleadings, but with the exception of default judgments, "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings.") Damages for signal leakage are, therefore, potentially recoverable against CAS. This analysis also underscores the point that it is the allegations of the complaint the Court must consider, rather than what damage items may be specified in the *ad damnum.*

Under the policy, "property damage" means:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

"Tangible property" is not defined in the policy. According to *Black's Law Dictionary,* "tangible property" is:

> Property that has physical form and substance and is not intangible. That which may be felt or touched, and is necessarily corporeal, although it may be real or personal. [citation omitted] *Compare* Intangible property.

*Black's Law Dictionary* (6th ed. 1990) "Intangible property" is "used chiefly in

---

4. Westfield also argues signal damage is not covered as a products-completed operations hazard, and even if signal loss were covered as a products-completed operations hazard, it falls under the general aggregate limit and so is not covered. Because the Court finds the intentional injury exclusion bars coverage for the alleged property damage, it need not reach these questions.

the law of taxation [and] means such property as has no intrinsic and marketable value, but is merely the evidence and representative of value." *Id.* Tangible property is necessarily corporeal. Although under Roman law, corporeal nature rested on the sense of touch,[5] in modern law, "all things which may be perceived by any of the bodily senses are termed corporeal[.]" *Id.* In contrast, "incorporeal property" is "that which consists in legal rights merely. The same as *choses in action* at common law." *Id.* "Incorporeal things" are "things which can neither be seen nor touched, such as consist in rights only, such as the mind alone can perceive." *Id.*

█ Property is either tangible or intangible. Tangible property is "necessarily corporeal," in contrast to incorporeal property, which comprises legal rights merely, theoretical entities, such as the mind alone can perceive. The cable signal is carried on a cable. If the cable is cut and not capped, the signal can leak. (*See* Wood Co. Compl. ¶ 9.) With signal leakage, the remaining signal strength is diminished. *Id.* Signal leakage may be worsened by moisture or corrosion. (Pl's. Mot. for Summ. J., Ex. C, Knotts dep. (page no. unreadable).) When the signal leaks it interferes with aircraft and police and HAM radio signals. *Id.* Signal leaks can be measured with a vehicle-mounted monitor, which picks up the leak through an antenna. (*Id.*, Lucas dep. at 69). The source of the leak can be further identified with a handheld monitor. *Id.* These cable signal characteristics are attributes of tangible and corporeal property rather than intangible, incorporeal, or theoretical entities.

Westfield next argues the policy only covers "occurrences," which means an "ac-

cident." Liability arising from "'property damage' expected or intended from the standpoint of the insured" is not covered. Because there is no dispute a CAS agent deliberately cut the cable lines, Westfield concludes there can be no liability for the resulting damage. The issue is not, however, simply whether CAS's agent intended the damaging act, but whether the resulting damage was intended from the standpoint of the insured.

The Supreme Court of Appeals of West Virginia has not determined the proper application of intentional injury exclusions in this context, although it outlined the problem:

> [C]ourts have taken different approaches when determining how specifically the insured must have "intended" the resulting injury. For example, the Supreme Court of New Jersey noted the following three approaches: (1) if there is subjective intent to injure, then any injury resulting from the action of the insured will be deemed "intentional" even if injury was different from what was intended; (2) if the injury that occurred is not the probable outcome of the intentional act, then an inquiry into the actual intent, then an inquiry into the actual intent of the insured to cause that injury is necessary; and (3) the insured must have intended the actual injury or must have been substantially certain that his or her actions would cause the injury.

*State Bancorp, Inc. v. United States Fid. and Guar. Ins. Co.*, 199 W.Va. 99, 107 n. 9, 483 S.E.2d 228, 235 n. 9 (1997)(citing *SL Indus., Inc. v. Am. Motorists Ins. Co.*, 128 N.J. 188, 607 A.2d 1266, 1277–78 (1992)). In *Leeber*, the West Virginia court noted,

---

**5.** *See* tangible, from the root *tangere,* Latin "to touch." Oxford English Dictionary, *available* *at* http://www.oed.com.

Most courts deny liability insurance *coverage* for alleged sexual misconduct by applying an objective test to an intentional injury exclusion in the policy. They hold that the insured must have intended not only the act (the alleged sexual contact), but also must have intended to cause *some* kind of *injury*. *Leeber*, 180 W.Va. at 379, 376 S.E.2d at 584. Sexual misconduct, however, is "inherently injurious [and] considered a criminal offense for which public policy precludes a claim of unintended consequences, that is, a claim that *no harm* was intended to result from the act." *Id.* For that reason, the court did not determine whether the general rule was the proper test of the harm intended because in sexual misconduct cases, the intent to cause some injury is inferred as a matter of law. *Id.*

A judge of this court carefully examined the subject of intentional injury exclusions more than a decade ago. *See Health Care and Retirement Corp. of America v. St. Paul Fire & Marine Ins. Co.*, 621 F.Supp. 155 (1985) (Copenhaver, J.) (declaring an insurer's duty to investigate where the complaint alone was not determinative of the character of intent of the acts alleged). After consideration of cases and treatises, Judge Copenhaver determined, similar to the West Virginia court, that the majority rule with respect to intentional injury exclusions is that "the exclusion applies if the insured intended to do a particular act, and intended to do some harm, even if the harm actually done was radically different from the harm intended." *Id.* at 161. The decision further recognized the general rule that,

> if the allegations in the action against the insured are unequivocal with regard to claiming injury or damage from the

wilful, intentional acts of the insured, and if the character of the acts alleged is such that it would, if proved, establish the insured's intent to cause the injury or damage, the insurer is under no duty to defend.

*Id.* (citing Annot., 2 A.L.R.3d 1238, "Liability Insurance: Specific Exclusion of Liability for Injury Intentionally Caused by Insured" (1965 & Supp.1984) (footnote omitted)).

In this case, the Court need not determine whether the Supreme Court of Appeals of West Virginia would apply the general rule or a broader interpretation of coverage under an intentional injury exclusion, that is, that the insurer has a duty to defend unless the complaint alleges an intent to cause precisely the damage otherwise covered by the policy.[6] Consideration of Charter's allegations reveals it alleges intentional actions undertaken to produce precise harms. In addition to paragraph nine of the Complaint, discussing signal leakage, cited above, additional relevant allegations in Charter's complaint against the insured allege:

> 19. Charter has no adequate remedy at law to prevent the defendant from continuing to operate in violation of the law and in *wrongfully attempting to cause plaintiff to lose customers and suffer a deterioration of its signal quality.*
>
> 20. The *defendant's actions as aforesaid are willful, wanton, intentional* and without regard for the rights of Charter and the customers it serves, and Charter will be irreparably harmed if the Court does not grant the requested injunction.

(Compl. ¶¶ 19, 20 (emphasis added).)

 The plain allegation is that CAS cut the cable, willfully and intentionally at-

---

6. As noted, the West Virginia court has consistently held the duty to defend is broader than the policy coverage, and insurance policies are to be liberally construed in favor of the insured. A requirement of precisely stated intentional injury in the allegations would serve those general considerations, broadening the duty to defend.

tempting to cause the harms alleged, i.e., signal leakage, deterioration of signal quality and customer loss. These allegations are unequivocal in claiming the damage flowed from willful and intentional acts of the insured, rather than accident or negligence. Accordingly, Westfield has no duty to defend based on property damage coverage provided in the CGL policy, which does not extend to property damage intended or expected from the standpoint of the insured.[7]

### E. Westfield's Duty to Defend: Advertising Injury

Allegations in the Wood County complaint relevant to this claim are:

12. On or about October 15, 2000, Charter discovered that defendant had entered into an agreement with the manager of Amber Hills Apartments in Parkersburg, WV, whereby defendant and the Manager of Amber Hills would represent to each of the twenty-four tenants served by Charter that defendant was now the exclusive provider of cable TV service, and would provide all service effective October 17, 2000 . . . .

13. Plaintiff also learned that defendant had agreed with the apartment Manager to provide free cable service in return for representing to each tenant that defendant was now the "exclusive" provider of service, and that all service by Charter would be terminated. *Such representations were illegal and knowingly false representations instigated by defendant to cause loss of Charter customers.*

. . .

16. Defendant has willfully and tortiously interfered with plaintiff's service contracts with its customers, and in concert with the Amber Hills Manager, *has*

*engaged in misrepresentations intended to interfere with and cause the loss of plaintiff's customers . . . .*

(Compl.¶¶ 12, 13, 16.)

■ Again, the allegations are not equivocal: Charter alleges CAS misrepresented it was the exclusive provider and directed the apartment manager to misrepresent likewise, knowing the representation was false. Even assuming, *arguendo,* this statement disparages Charter's service, injuries arising out of knowing misrepresentation are not covered under the CGL policy. The acts alleged are entirely foreign to the risk insured against, and Westfield has no duty to defend this action.

### III. CONCLUSION

Having determined that no part of the claims against CAS fall within Westfield's CGL policy coverage, the Court **GRANTS** Westfield's motion for summary judgment. CAS's motion for summary judgment is **DENIED** and its motion for attorney fees and costs is **DENIED** as moot.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record by facsimile transmission and first class mail and publish it on the Court's website at www.wvsd.uscourts.gov.

### JUDGMENT ORDER

In accordance with the Memorandum Opinion and Order entered this day, the Court **ORDERS** the case **DISMISSED** and **STRICKEN** from the docket.

The Clerk is directed to send a copy of this Judgment Order to counsel of record.

---

7. Because the commercial umbrella coverage for property damage contains the same intentional injury exclusion, there also is no duty to defend under that portion of the policy.